[Crim. No. 20340. Mar. 15, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES ROBERT PRIVITERA, JR., et al., Defendants and Appellants.

## COUNSEL

Patrick J. Hennessey, under appointment by the Supreme Court, Appellate Defenders, Inc., under appointment by the Court of Appeal, S. J. Sinton, Paul Bell, Jerry W. Kane, Daniel F. Bamberg, Bamberg, Flanigan & Flanigan and Stephen Tornay for Defendants and Appellants.

David H. Gill II, Salciccia, Killen & Gill, Greg D. Genochio, Steven J. Rosenberg, Trecker & Rosenberg, Arthur M. Sohcot, Mark I. Soler, Treuhaft & Walker, V. James Jackl, Belzer, Jackl & Lane, Scott Noble, George W. Cody and Terrance W. Flanigan as Amici Curiae on behalf of Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, A. Wells Petersen, Harley D. Mayfield, Bernard A. Delaney, Jr., and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

Hassard, Bonnington, Rogers & Huber, Howard Hassard, Joseph S. Rogers, David E. Willett, Rick C. Zimmerman, Gary A. Gavello, Grace Powers Monaco, Wheatley & Miller, John K. Van de Kamp, District Attorney (Los Angeles), Harry B. Sondheim, Barry R. Levy, Deputy District Attorneys, John H. Shenefield, Assistant Attorney General (United States), Barry Grossman, Catherine G. O'Sullivan, Peter L. De La Cruz, Bruce E. Fein, Richard M. Cooper, Eugene M. Pfeifer and Arnold I. Friede as Amici Curiae on behalf of Plaintiff and Respondent.

## OPINION

**CLARK, J.**—Under California Health and Safety Code section 1707.1, it is a misdemeanor to sell, deliver, prescribe or administer any drug or device to be used in the diagnosis, treatment, alleviation or cure of cancer which has not been approved by the designated federal agency (21 U.S.C. § 355) or by the state board (Health & Saf. Code, § 1704).[1]

---

[1]Section 1707.1 provides: "The sale, offering for sale, holding for sale, delivering, giving away, prescribing or administering of any drug, medicine, compound or device to be used in the diagnosis, treatment, alleviation or cure of cancer is unlawful and prohibited unless (1) an application with respect thereto has been approved under Section 505 of the Federal Food, Drug and Cosmetic Act, or (2) there has been approved an

Defendants James Robert Privitera, Jr., a medical doctor, William David Turner, Phyllis Blanche Disney, Winifred Agnes Davis, and Carroll Ruth Leslie were convicted by jury of the felony of conspiracy to sell and to prescribe an unapproved drug—laetrile—intended for the alleviation or cure of cancer. (Pen. Code, § 182, subd. 1; Health & Saf. Code, § 1707.1.) Davis and Turner were also convicted of selling laetrile for the alleviation or cure of cancer. (Health & Saf. Code, § 1707.1.)

■ Viewed in the light most favorable to the judgments (see *People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]), the evidence amply supports the jury's conclusion that defendants were involved in a common plan to import, prescribe, sell and distribute laetrile (also referred to as amygdalin or vitamin B-17) to cancer patients. Dr. Privitera prescribed laetrile for cancer patients and referred his patients to Turner and Disney as suppliers of laetrile. Disney referred patients to Dr. Privitera for treatment. Leslie and Disney worked as distributors in various residential areas. Defendants told prospective users that laetrile is an effective treatment or cure for cancer. Laetrile has not been approved for that purpose by one of the designated governmental agencies.

■ Defendants appeal on the ground the statute is unconstitutional. They contend the *right of privacy* protected by the federal and California Constitutions includes a right to obtain laetrile or, more generally, a right of access to drugs not recognized by the government as effective. Fundamental rights, defendants point out, may be regulated only to the extent necessary to achieve a compelling state interest. Defendants argue the purported right to obtain laetrile is fundamental and therefore the regulation challenged here must be reviewed under the compelling state interest standard. Section 1707.1 is found to be unconstitutional, defendants conclude, when measured against that standard.

application filed with the board setting forth: [¶] (a) Full reports of investigations which have been made to show whether or not such drug, medicine, compound or device is safe for such use, and whether such drug, medicine, compound or device is effective in such use; [¶] (b) A full list of the articles used as components of such drug, medicine, compound or device; [¶] (c) A full statement of the composition of such drug, medicine, compound or device; (d) A full description of the methods used in, and the facilities and controls used for, the manufacture, processing and packing of such drug, medicine or compound or in the case of a device, a full statement of its composition, properties and construction and the principle or principles of its operation; [¶] (e) Such samples of such drug, medicine, compound or device and of the articles used as components of the drug, medicine, compound or device as the board may require; and [¶] (f) Specimens of the labeling and advertising proposed to be used for such drug, medicine, compound or device."

We hold the asserted right to obtain drugs of unproven efficacy is *not* encompassed by the right of privacy embodied in either the federal or the state Constitutions. The appropriate standard of review, therefore, is the rational basis test, rather than the compelling state interest test. We conclude section 1707.1 amply satisfies the applicable standard by bearing a reasonable relationship to the achievement of the legitimate state interest in the health and safety of its citizens.

## THE UNITED STATES CONSTITUTION

■ The Supreme Court has held that regulations limiting certain fundamental rights may be justified only by a compelling state interest (*Kramer* v. *Union School District* (1969) 395 U.S. 621, 627 [23 L.Ed.2d 583, 589-590, 89 S.Ct. 1886]; *Shapiro* v. *Thompson* (1969) 394 U.S. 618, 634 [22 L.Ed.2d 600, 615, 89 S.Ct. 1322]; *Sherbert* v. *Verner* (1963) 374 U.S. 398, 406 [10 L.Ed.2d 965, 971-972, 83 S.Ct. 1790]), and that legislative enactments must be narrowly drawn to express only the legitimate state interests at stake (*Griswold* v. *Connecticut* (1965) 381 U.S. 479, 485 [14 L.Ed.2d 510, 515-516, 85 S.Ct. 1678]; *Aptheker* v. *Secretary of State* (1964) 378 U.S. 500, 508 [12 L.Ed.2d 992, 998-999, 84 S.Ct. 1659]; *Cantwell* v. *Connecticut* (1940) 310 U.S. 296, 307-308 [84 L.Ed. 1213, 1219-1220, 60 S.Ct. 900, 128 A.L.R. 1352]). The right of privacy, founded in the Fourteenth Amendment's concept of personal liberty and restriction upon state action, has been declared a fundamental right. (*Roe* v. *Wade* (1973) 410 U.S. 113, 152-155 [35 L.Ed.2d 147, 176-178, 93 S.Ct. 705].) Thus, if the right of privacy were implicated in this case the challenged statute would, arguably, be judged under the compelling state interest standard.[2]

■ However, a fundamental privacy right is not at stake here. The interest defendants allege is, apparently, "the interest in independence in making certain kinds of important decisions." (*Whalen* v. *Roe* (1977) 429 U.S. 589, 599-600 [51 L.Ed.2d 64, 73, 97 S.Ct. 869].) But the kinds of "important decisions" recognized by the high court to date as falling within the right of privacy involve " 'matters relating to marriage, procreation, contraception, family relationships, and child rearing and education' " (*Whalen* v. *Roe, supra,* 429 U.S. at p. 600, fn. 26 [51 L.Ed.2d at p. 74], quoting *Paul* v. *Davis* (1976) 424 U.S. 693, 713 [47 L.Ed.2d 405, 420-421, 96 S.Ct. 1155]), but do not include medical treatment.

---

[2]However, as we shall see, even statutes restricting exercise of a right found by the United States Supreme Court to be a fundamental privacy right are reviewed under the rational basis standard when the danger to health is significant. (*Roe* v. *Wade, supra,* 410 U.S. 113, 163 [35 L.Ed.2d 147, 182-183].)

For this reason defendants' reliance on *Roe* v. *Wade, supra,* 410 U.S. 113, is misplaced. In that case a majority of the high court held the decision to have an abortion falls within the right of privacy, a conclusion following from the court's earlier decisions that activities relating to procreation (*Skinner* v. *Oklahoma* (1942) 316 U.S. 535, 541-542 [86 L.Ed. 1655, 1660-1661, 62 S.Ct. 1110]) and contraception (*Eisenstadt* v. *Baird* (1972) 405 U.S. 438, 453-454 [31 L.Ed.2d 349, 362-363, 92 S.Ct. 1029]) were also protected by that right. (410 U.S. at pp. 152-153 [35 L.Ed.2d at pp. 176-177].) However, emphasizing that this privacy right is not absolute, the court stated: "The Court's decisions recognizing a right of privacy also acknowledge that some state regulation in areas protected by that right is appropriate. As noted above, a State may properly assert important interests in safeguarding health, in maintaining medical standards, and in protecting potential life. . . . The privacy right involved, therefore, cannot be said to be absolute." (410 U.S. at pp. 153-154 [35 L.Ed.2d at p. 177].)

Significantly, when danger to health exists *Roe* v. *Wade* indicates that state regulation shall be tested under the *rational basis* standard. (410 U.S. at p. 163 [35 L.Ed.2d at pp. 182-183].) Indeed, the high court held in *Roe* v. *Wade* that a state may—without encroaching upon any right of privacy—further its important interests "in the areas of health and safety" by requiring abortions be performed at licensed institutions which "insure maximum safety for the patient" and prohibiting performance of abortion by a person not a physician as defined by state law. (410 U.S. at pp. 149, 150, 163-165 [35 L.Ed.2d at pp. 175, 182-184].) The lesson of *Roe* v. *Wade* for our case is that a requirement that a drug be certified effective for its intended use is a reasonable means to "insure maximum safety for the patient."

In *Planned Parenthood of Missouri* v. *Danforth* (1976) 428 U.S. 52 [49 L.Ed.2d 788, 96 S.Ct. 2831], the high court struck down a state prohibition of a particular abortion procedure on the ground the prohibition did not reasonably relate to preservation and protection of maternal health. Significantly, in discussing the validity of the statutory prohibition of the medical procedure, the court did not refer to any constitutional considerations of privacy. Rather the procedure was evaluated by the court on the basis of medical evidence of its safety and effectiveness under the rational basis standard. *Planned Parenthood* thus stands for the proposition that although the decision to have an abortion may be within the constitutional zone of privacy deserving the protection provided by the compelling interest standard, the selection of a particular procedure is a medical

matter to which privacy status does not attach and which may be regulated by the government, providing a rational basis for such regulation exists.

*Whalen v. Roe, supra,* 429 U.S. 589 provides additional support for our conclusion that the appropriate standard for reviewing section 1707.1 is the rational basis test. In *Whalen v. Roe* the high court upheld a New York statute requiring that the patient's name, address and age—among other information—be filed with the state department of health whenever a "Schedule II" drug is prescribed.[3] Finding the state "had been unable to demonstrate the necessity for the patient-identification requirement on the basis of its experience during the first 20 months of administration of the new statute," the district court held that " 'the doctor-patient relationship is one of the zones of privacy accorded constitutional protection' and that the patient-identification provisions of the Act invaded this zone with 'a needlessly broad sweep.' " (429 U.S. at p. 596 [51 L.Ed.2d at p. 71].) Rejecting the standard employed by the district court, the high court reaffirmed that "State legislation which has some effect on individual liberty or privacy may not be held unconstitutional simply because a court finds it unnecessary, in whole or in part. For we have frequently recognized that individual States have broad latitude in experimenting with possible solutions to problems of vital local concern." (*Id.,* at p. 597, fns. omitted [51 L.Ed.2d at p. 72].)

Although recognizing that, "[u]nquestionably, some individuals' concern for their own privacy may lead them to avoid or to postpone needed medical attention" (*id.,* at p. 602 [51 L.Ed.2d at p. 75]), the Supreme Court upheld the patient-identification requirement under the rational basis test. "The New York statute challenged in this case represents a considered attempt to deal with [a problem of vital local concern]. It is manifestly the product of an orderly and rational legislative decision. . . . There surely was nothing unreasonable in the assumption that the patient-identification requirement might aid in the enforcement of laws designed to minimize the misuse of dangerous drugs. For the requirement could reasonably be expected to have a deterrent effect on potential violators as well as to aid in the detection or investigation of specific instances of apparent abuse. At the very least, it would seem clear that the

---

[3]The New York statute classified potentially harmful drugs in five schedules. Drugs, such as heroin, which are highly abused and have no recognized medical use, are in schedule I. Schedules II through V include drugs which have a progressively lower potential for abuse but also have a recognized medical use. Schedule II includes the most dangerous of the legitimate drugs. (*Id.,* at pp. 592-593 [51 L.Ed.2d at pp. 69-70].)

State's vital interest in controlling the distribution of dangerous drugs would support a decision to experiment with new techniques for control. For if an experiment fails—if in this case experience teaches that the patient-identification requirement results in the foolish expenditure of funds to acquire a mountain of useless information—the legislative process remains available to terminate the unwise experiment. It follows that the legislature's enactment of the patient-identification requirement was a reasonable exercise of New York's broad police powers." (*Id.,* at pp. 597-598 [51 L.Ed.2d at pp. 72-73].)

Finally, the high court reiterated: "It is, of course, well settled that the State has broad police powers in regulating the administration of drugs by the health professions. *Robinson* v. *California,* 370 U.S. [660], at 664-665; *Minnesota* ex rel. *Whipple* v. *Martinson,* 256 U.S. [41], at 45; *Barsky* v. *Board of Regents,* 347 U.S. 442, 449." (*Whalen* v. *Roe, supra,* at p. 603, fn. 30 [51 L.Ed.2d at p. 75].) Although it had not done so, the court observed, "the State no doubt could prohibit entirely the use of particular Schedule II drugs." (*Id.,* at p. 603 [51 L.Ed. at p. 75].) If the state has the power to ban a drug with a recognized medical use because of its potential for abuse, then—given a rational basis for doing so—the state clearly has the power to ban a drug not recognized as effective for its intended use.

The legitimate state interest expressed in the challenged statute is set forth in the legislative findings recited in section 1700. "The effective diagnosis, care, treatment or cure of persons suffering from cancer is of paramount public importance. Vital statistics indicate that approximately 16 percent of the total deaths in the United States annually result from one or another of the forms of cancer. It is established that accurate and early diagnosis of many forms of cancer, followed by prompt application of methods of treatment which are scientifically proven, either materially reduces the likelihood of death from cancer or may materially prolong the useful life of individuals suffering therefrom. [¶] Despite intensive campaigns of public education, there is a lack of adequate and accurate information among the public with respect to presently proven methods for the diagnosis, treatment, and cure of cancer. Various persons in this State have represented and continue to represent themselves as possessing medicines, methods, techniques, skills, or devices for the effective diagnosis, treatment, or cure of cancer, which representations are misleading to the public, with the result that large numbers of the public, relying on such representations, needlessly die of cancer, and substantial

amounts of the savings of individuals and families relying on such representations are needlessly wasted." (Health & Saf. Code, § 1700.)

These findings were recently echoed by the Commissioner of the federal Food and Drug Administration with specific reference to laetrile. "In the Commissioner's opinion, the use of Laetrile in the United States has become a genuine public health problem. Increasingly, doctors dealing with cancer patients are finding that the patients are coming to legitimate therapy too late, having delayed while trying Laetrile. It seems clear that another substantial group of persons afflicted with cancer is avoiding effective therapy altogether and using Laetrile instead. The question has become one of life and death for these patients and for others who may be convinced to use Laetrile in the future." (42 Fed.Reg. 39769.)

The commissioner rendered his opinion at the conclusion of a rulemaking proceeding undertaken in compliance with the opinion of the court of appeals in *Rutherford* v. *United States* (10th Cir. 1976) 542 F.2d 1137, and the order of the district court in *Rutherford* v. *United States* (W.D.Okla. 1977) 424 F.Supp. 105. "Based upon a careful review of the administrative record," the commissioner found that "Laetrile is not generally recognized by qualified experts as a safe and effective cancer drug." (42 Fed.Reg. 39775.) The commissioner further found laetrile does not qualify for exemption from the new drug provision of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 301 et seq.) by virtue of compliance with the 1962 grandfather clause of the act. (42 Fed.Reg. 39795.) Distribution of laetrile in interstate commerce, the commissioner concluded, is thus illegal and subject to regulatory activity by the Food and Drug Administration.

Because of defendants' reliance on it, subsequent developments in the *Rutherford* case will now be considered. In *Rutherford* v. *United States* (W.D.Okla. 1977) 438 F.Supp. 1287, the district court set aside the commissioner's action and enjoined federal authorities from interfering with distribution of laetrile in interstate commerce or with use of laetrile for the treatment of cancer. The decision was based on two grounds: First, contrary to the conclusion reached by the commissioner, the court held that laetrile is exempt from the premarket approval requirement for new drugs by virtue of compliance with the 1962 grandfather clause. (438 F.Supp. at pp. 1294-1298.) Second, contrary to the conclusion we reach today, the court concluded the federal right of privacy encompasses a

"right to use a nontoxic substance in connection with one's own personal health-care." (*Id.*, at p. 1301.)

On appeal by the government, the court of appeals addressed neither the grandfather clause question nor the right of privacy issue. Instead, the court held that "the 'safety' and 'effectiveness' terms used in the statute have no reasonable application to terminally ill cancer patients." "We are considering only cancer patients who are terminally ill and only their intravenous use of Laetrile. Thus in this context, what can 'generally recognized' as 'safe' and 'effective' mean as to such persons who are so fatally stricken with a disease for which there is no known cure? What meaning can 'effective' have in the absence of anything which may be used as a standard? Under this record Laetrile is as effective as anything else. What can 'effective' mean if the person, by all prevailing standards . . . is going to die of cancer regardless of what may be done." The permanent injunction granted by the district court was continued but limited only to permit procurement of intravenous injections of laetrile administered by a licensed medical practitioner to persons who are certified by a licensed medical practitioner to be terminally ill of cancer in some form. (*Rutherford* v. *United States* (10th Cir. 1978) 582 F.2d 1234.)[4]

Defendants can take no comfort in the court of appeals' decision for, unlike *Rutherford,* this case is not an action on behalf of the class of terminally ill cancer patients. Whatever may be said in favor of permitting "terminal" cancer patients access to laetrile, there is no indication in the record that defendants sought to restrict their activities to that class when prescribing, distributing and administering laetrile. Indeed, the record reflects that Dr. Privitera sometimes neither took a medical history from nor personally examined the patients for whom he prescribed laetrile. The lay defendants, of course, were not qualified to diagnose cancer, much less to determine whether a cancerous condition was "terminal."

Moreover, we are not prepared to reject as unreasonable the explanation given by the commissioner for the Food and Drug Administration's refusal to approve laetrile for use by "terminal" cancer patients.[5] The commissioner concluded: "[A]pproval of Laetrile restricted to 'terminal' patients would lead to needless deaths and suffering among (1) patients

---

[4]On 22 January 1979 certiorari was granted in *Rutherford.* (— U.S. — [59 L.Ed.2d 87, 99 S.Ct. 1042].)

[5]The court of appeals did not mention or discuss the reasons given by the commissioner.

characterized as 'terminal' who could actually be helped by legitimate therapy and (2) patients clearly susceptible to the benefits of legitimate therapy who would be misled as to Laetrile's utility by the limited approval program or who would be able to obtain the drug through the inevitable leakage in any system set up to administer such a program." (42 Fed.Reg. 39805.) Substantial evidence in the administrative record appears to support the conclusion reached by the commissioner.[6] Certainly the record in this case does not inspire one with confidence that advocates of laetrile would cooperate with a regulation restricting it to "terminal" cancer patients. In studied defiance of current law, Dr. Privitera prescribed and administered the drug as a cancer cure, advised his patients to discontinue conventional treatment, and warned them not to let their regular physicians know they were taking laetrile.

In conclusion, we emphasize we are not taking sides on the fiercely contested medical questions regarding laetrile's safety or efficacy as a cancer drug. Laetrile advocates may yet be vindicated in the court of scientific opinion, for even as this is being written the National Cancer Institute is seeking approval from the Food and Drug Administration to test laetrile on advanced cancer patients. (*Cancer Institute Seeks to Test Laetrile,* L.A. Times (Sept. 28, 1978) pt. I, p. 14, cols. 1-6.) Nor are we endorsing the decision the Legislature has made on the basis of existing scientific evidence. Whether cancer patients—especially advanced cancer patients who have unsuccessfully sought relief from conventional therapy and who are fully informed as to the consensus of scientific opinion concerning the drug—should have access to laetrile is clearly a question about which reasonable persons may differ. It is not our function to render scientific or legislative judgments. Rather, we must resolve a narrow question: Does the challenged legislation bear a reasonable relationship to the achievement of the legitimate state interest in the

---

[6]For example, with regard to the impossibility of determining "who is terminal," the commissioner cited Dr. Peter H. Wiernik, chief of the clinical oncology branch of the National Cancer Institute's Baltimore Cancer Research Center, who stated "One major difficulty in making a particular chemical available for terminal patients only is that no one can prospectively define the term 'terminal' with any accuracy. A patient can be said to be terminal only after he dies. Many patients who are critically ill respond to modern day management of cancer." This opinion was shared by Dr. Joseph F. Ross, professor of medicine at the University of California School of Medicine at Los Angeles. Dr. Ross stated "[T]he distinction of 'terminal' patients from 'nonterminal' may not be reliably determined and an assumption that Laetrile may be given to such patients with impunity may deprive such patients of therapeutic measures which could help them." As Helene Brown, executive director of Cancer Control/Los Angeles, put it, "No one knows if and when any patient is going to die." (42 Fed.Reg. 39805.)

health and safety of its citizens? We conclude section 1707.1 does satisfy this standard and that it therefore does not encroach upon the federal constitutional right of privacy.

## THE STATE CONSTITUTION

Having determined the federal constitutional right of privacy does not encompass a right of access to drugs of unproven efficacy, we next determine whether the voters of California intended to create such a right in November 1972 when they amended article I, section 1 of our Constitution to include among the various "inalienable" rights of "all people" the right of "privacy."[7]

There is simply no evidence of such intent. ■ To the contrary, in *White* v. *Davis* (1975) 13 Cal.3d 757 [120 Cal.Rptr. 94, 533 P.2d 222], we observed "the moving force behind the new constitutional provision was a more focussed privacy concern, relating to the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society. The new provision's primary purpose is to afford individuals some measure of protection against this most modern threat to personal privacy." (*Id.,* at p. 774.) As we further observed, "[t]he principal objectives of the newly adopted provision are set out in a statement drafted by the proponents of the provision and included in the state's election brochure," the beginning paragraphs of which we then quoted: " 'The proliferation of government snooping and data collecting is threatening to destroy our traditional freedoms. Government agencies seem to be competing to compile the most extensive sets of dossiers of American citizens. Computerization of records makes it possible to create "cradle-to-grave" profiles of every American. [¶] *At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.*' (Italics in the original.)" (13 Cal.3d at p. 774.)

The election brochure argument by the proponents of the provision "represents, in essence, the only 'legislative history' of the constitutional amendment available to us." (*Id.,* at p. 775.) In the absence of any evidence that the voters in amending the California Constitution to create

---

[7]Article I, section 1 (as reworded by constitutional amendment in Nov. 1974) now reads: "All people are by nature free and independent, and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

a right of privacy intended to protect conduct of the sort engaged in by defendants, we have no hesitation in holding that section 1707.1 does not offend that constitutional provision.

### FAILURE TO PRESERVE SEARCH AND SEIZURE ISSUE

■ Defendants finally contend that the trial court erred in denying their motion to suppress certain evidence obtained on execution of a telephonic search warrant.

Subdivision (b) of section 1528 of the Penal Code provides in pertinent part that a magistrate may orally authorize a peace officer to sign the magistrate's name on a duplicate original search warrant. Defendants argue that attempted action under this provision failed here because the person authorized to sign the magistrate's name—a federal customs service special agent—was not a "peace officer" under California law.

The People correctly respond that defendants are precluded from raising this issue by their failure to preserve it by appropriate objection below. "[T]he general rule [is] that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal. (See Evid. Code, § 353; *People* v. *Welch* (1972) 8 Cal.3d 106, 114-115 [104 Cal.Rptr. 217, 501 P.2d 225]; *People* v. *De Santiago* (1969) 71 Cal.2d 18, 22 [76 Cal.Rptr. 809, 453 P.2d 353].) The contrary rule would deprive the People of the opportunity to cure the defect at trial and would 'permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal.' (*Coy* v. *Superior Court* (1959) 51 Cal.2d 471, 473 [334 P.2d 569].)" (*People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048].)

The reason for the rule is well illustrated here. While conceding a federal customs agent is not, per se, a "peace officer" under California law (see Pen. Code, § 7, subd. 8, and § 830 et seq.), the People suggest Agent Nadel may nevertheless have acquired such status by a process of cross-deputization. As the issue was not raised below, the People had no occasion to pursue the point and, therefore, defendants may not raise it now.

We have considered defendants' remaining contentions and find them to lack merit.

The judgments of conviction are affirmed.

Tobriner, J., Mosk, J., Richardson, J., and Manuel, J., concurred.

**BIRD, C. J.**—I respectfully dissent.

I do not question for a moment that the effective treatment of persons suffering from cancer is a matter of paramount public importance. However, we are dealing here with a disease whose causes and treatment continue to baffle the medical community. Among physicians and scientists themselves there remains legitimate dispute as to what is truly an effective program of treatment for cancer. So long as there is no clear evidence that laetrile is unsafe to the user, I believe each individual patient has a right to obtain the substance from a licensed physician who feels it appropriate to prescribe it to him.

Cancer is a disease with potentially fatal consequences; this makes the choice of treatment one of the more important decisions a person may ever make, touching intimately on his or her being. For this reason, I believe the right to privacy, recognized under both the state and federal Constitutions, prevents the state from interfering with a person's choice of treatment on the sole grounds that the person has chosen a treatment which the state considers "ineffective."

The right of privacy is a concept of as yet undetermined parameters. Justice Staniforth's opinion for the Court of Appeal in this case provides as decent a map through this difficult terrain as I believe is available. For this reason, I herewith reprint his opinion.*

---

*Since Justice Staniforth wrote the opinion which I am setting forth here, the case of *Rutherford* v. *United States* has continued its way through the courts. In 1977 the Federal Drug Administration held administrative proceedings and determined that laetrile was a "new drug," and that it should not receive agency approval, since the drug was not proven "safe and effective" in the treatment of cancer. The case then returned to federal district court, where the judge set aside the Federal Drug Administration determination and enjoined the agency from interfering with the use of laetrile by *terminally* ill cancer patients. (*Rutherford* v. *United States* (W.D.Okla. 1977) 438 F.Supp. 1287, 1301.) On appeal, the Tenth Circuit Court of Appeals affirmed. The court noted: "We are considering only cancer patients who are terminally ill . . . . [I]n this context, what can 'generally recognized' as 'safe and effective' mean as to such persons who are so fatally stricken with a disease for which there is no known cure? What meaning can 'effective' have in the absence of anything which may be used as a standard?" (*Rutherford* v. *United States* (10th Cir. 1978) 582 F.2d 1234.) On Monday, January 22, 1979, the United States Supreme Court agreed to hear the *Rutherford* case. (See Los Angeles Times, Mon., Jan. 22, 1979, p. 1.)

Under California Health and Safety Code section 1707.1,[1] it is a misdemeanor to sell, deliver, prescribe or administer any drug or device to be used in the diagnosis, treatment, alleviation or cure of cancer which has not been approved by the designated federal agency (21 U.S.C.S. § 355) or by a state board (Health & Saf. Code, § 1704).

Defendants, James Robert Privitera, Jr., a medical doctor, William David Turner, Phyllis Blanche Disney, Winifred Agnes Davis, and Carroll Ruth Leslie, were convicted by jury of a felony, conspiracy to sell, to prescribe, an unapproved drug, laetrile, intended for the alleviation or cure of cancer. (Pen. Code, § 182, subd. 1; Health & Saf. Code, § 1707.1.) Davis and Turner were convicted of selling laetrile to be used for the alleviation or cure of cancer. (Health & Saf. Code, § 1707.1.)

We view the evidence in the light most favorable to the judgments. (*People* v. *Reilly,* 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) The defendants were involved in a common plan to import, distribute and prescribe laetrile (also referred to as amygdalin or vitamin B-17) to cancer patients. Defendants Turner and Davis were the importers and chief suppliers of the drug. Defendants Leslie and Disney worked as the distribution network in various residential areas. Dr. Privitera prescribed amygdalin for cancer victims (or to undercover state agents represented to be cancer victims). Dr. Privitera referred patients to Turner and Davis to buy the amygdalin; Disney referred patients to Dr. Privitera for treatment.

---

[1]Health and Safety Code section 1707.1 provides:

"The sale, offering for sale, holding for sale, delivering, giving away, prescribing or administering of any drug, medicine, compound or device to be used in the diagnosis, treatment, alleviation or cure of cancer is unlawful and prohibited unless (1) an application with respect thereto has been approved under Section 505 of the Federal Food, Drug and Cosmetic Act [21 USCS § 355], or (2) there has been approved an application filed with the board setting forth:

"(a) Full reports of investigations which have been made to show whether or not such drug, medicine, compound or device is safe for such use, and whether such drug, medicine, compound or device is effective in such use;

"(b) A full list of the articles used as components of such drug, medicine, compound or device;

"(c) A full statement of the composition of such drug, medicine, compound or device;

"(d) A full description of the methods used in, and the facilities and controls used for, the manufacture, processing and packing of such drug, medicine or compound or in the case of a device, a full statement of its composition, properties and construction and the principle or principles of its operation;

"(e) Such samples of such drug, medicine, compound or device and of the articles used as components of the drug, medicine, compound or device as the board may require; and

"(f) Specimens of the labeling and advertising proposed to be used for such drug, medicine, compound or device."

The defendants told the prospective users of the drug that amygdalin was an effective treatment or cure for cancer. Substantial evidence supports the jury finding of a common plan or agreement to supply and prescribe amygdalin as a cancer cure. Laetrile has not been "approved" by a designated governmental agency.

## I

*Contentions of the Parties—Factual and Legal*

Dr. Privitera contends that California Health and Safety Code section 1707.1 is an unconstitutional invasion of the cancer victim's right to obtain and use amygdalin in violation of rights guaranteed by the United States Constitution, Amendments I, IV, V, VI, VII, VIII, and XIV, and California Constitution, article I, sections 1, 7, 7(a) and 15. This, he asserts, is an invasion of the patient's right of privacy, his or her right to be left alone in choice of orthodox versus unorthodox treatment of cancer. As a corollary and necessary concommitant of the right of privacy of the patient, Dr. Privitera argues that the constitutional protection accorded the cancer victim's right to utilize amygdalin in a program of nutritional therapy extends to physicians willing to administer the drug and to persons willing to supply the drug for the cancer victim's use. Argues Dr. Privitera: "The protection of constitutional guarantees of privacy and personal liberty, therefore, extends not only to the patient pursuing a course of nutritional therapy but to the physician who prescribes and administers the therapy and to the person who furnishes the essential components."

Dr. Privitera does not challenge the validity of the general or specific regulatory laws to the extent they prohibit the advertisement of amygdalin as a cure for cancer (Health & Saf. Code, § 1714); or require amygdalin be labeled in accordance with state law and regulations (Health & Saf. Code, § 26463); or impose standards on the manufacturing and packing of amygdalin to insure quality and prevent adulteration or deterioration, or the prohibition of the sale of amygdalin to members of the general public for the purpose of treating cancer by persons other than licensed physicians (Health & Saf. Code, § 26400 et seq.). (Health & Saf. Code, §§ 1704, 26670, 1707.1, 1709; Cal. Admin. Code, tit. 17, § 10400.1.)

Rather, Dr. Privitera's challenge is directed to those laws, specifically the one of which he is convicted, insofar as they prohibit a duly licensed

physician from administering amygdalin to cancer patients and which prohibit its sale to either licensed physicians or persons who have obtained prescriptions from a licensed physician. (Health & Saf. Code, §§ 1700-1721.)

According to Dr. Privitera, this right of choice of medical treatment is a fundamental right of the individual and regulations limiting this right may be justified only by "compelling state interests"; the legislative enactments which seek to regulate or control in the areas of such fundamental rights must be narrowly drawn to protect only the legitimate state interests at stake.

The specific drug here supplied or prescribed is a substance known as amygdalin, also known as laetrile, and also known as vitamin B-17. Amygdalin is a by-product of apricot pits. The substance has been the subject of widespread public dispute as to its efficacy for the treatment of cancer. Orthodox medicine, as represented by the American Cancer Society, places it in the area of nostrums. Its proponents vary in their claims from that as a cure for cancer or as simply a nutritional aid causing the patient to gain weight, have a better appetite, and a better emotional outlook. It is generally conceded that amygdalin is nontoxic; it does not fall within the general ban of drugs which are toxic, habit forming, addictive, or otherwise distort reality. Conventional medicine regards the "evidence," "proof," of the curative effect of amygdalin as anecdotal in nature and contends the drug has never been established by scientific methodology to have any effect whatsoever upon either the cure or retardation of cancer growth. Despite the pros and cons of the experts in the field of medicine, and others from nonmedical fields taking side on this issue, cancer victims in large numbers have sought the relief, whatever its nature, which is available from the use of this drug. Where, as in Mexico and in West Germany, the drug is available through doctors and clinics, cancer victims, able to travel, seek out and obtain the treatment.

Dr. Privitera points out that many cancer victims have investigated and evaluated the merits of surgery, radiation therapy or chemotherapy with the aid of competent medical advice and have made the highly personal decision [that] the benefits from such therapy [are] not sufficient to justify the risks which include disfigurement, debilitation, and accelerated death and for this reason have chosen to seek amygdalin as a treatment; other cancer victims have been advised that their condition is hopeless, their case is terminal and as a last resort before certain death, seek amygdalin.

Dr. Privitera contends many conceded cancer victims, competent and responsible adults, seek and use amygdalin as a food substance to ameliorate the horrifying physical wasting away of the body (cachexia) which accompanies cancer. Thus they seek amygdalin not only for its possible cancer curative benefits, but also for its known nutritional benefits. Cancer victims cannot be certain amygdalin will either cure or control cancer but they believe, based upon the anecdotal, personal experience approach, the drug provides relief from the terrible pain, mental malaise, the emotional depression and weight loss which mark the progression of their disease.

The People assert, contrary to Dr. Privitera's contentions, not a single accredited medical school in the State of California teaches amygdalin might be effective in the controlling or curing of cancer. Further the use of amygdalin as a form of nutritional therapy is officially regarded by the State Department of Health, the California Medical Association, the National Cancer Institute and a great block of practicing physicians, to be of no value whatsoever in the controlling or curing of cancer.

Dr. Privitera specifically contends section 1707.1 of the Health and Safety Code is unconstitutional. It is a denial of one aspect of individual "liberty" protected by the due process clause of the Fourteenth Amendment.

The patient, he asserts, has a right of "privacy" or "a guarantee of certain areas or zones of privacy." This is the individual right of independence in making certain kinds of important decisions. The very nature of the relationship, the act to be performed, the decision to be made, precludes unjustified state presence. It is "the right of the individual to be free in action, thought, experience and belief from governmental compulsion." (Kurland, *The Private I* (Autumn 1976) U. Chic. Magazine 7.) It is that right voiced by Justice Brandeis in his dissent in *Olmstead* v. *United States,* 227 U.S. 438, 478 [72 L.Ed. 944, 956, 48 S.Ct. 564, 572, 66 A.L.R. 376] "the right to be let alone," "the right most valued by civilized men."

Historically this right of privacy was first articulated as a constitutional right in *Griswold* v. *Connecticut,* 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678], a decision holding unconstitutional a statute prohibiting the use of contraceptives. However, the recognition of the existence, innate in every human being, of a zone of privacy is older than the Bill of Rights, older than our political parties, older than the state's concern with the nature of

treatment to be received by cancer-ridden patients. It is in the nature of man that such right exists.

This principle, now of constitutional dimension, has been embraced by many decisions in a variety of situations.[2] (See *In re Lifschutz,* 2 Cal.3d 415, 432, fn. 12 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1], and *Roe* v. *Wade,* 410 U.S. 113, 151-153 [35 L.Ed.2d 147, 175-177, 93 S.Ct. 705, 726].) This concept, when placed in the doctor-patient relationship is the "right to decide independently, with the advice of his physician, to acquire and to use needed medication." (*Whalen* v. *Roe,* 429 U.S. 589, 603 [51 L.Ed.2d 64, 75, 97 S.Ct. 869, 876, 878]; *Doe* v. *Bolton,* 410 U.S. 179, 197 [35 L.Ed.2d 201, 215-216, 93 S.Ct. 739, 750].) *In re Lifschutz, supra,* 2 Cal.3d 415, 431, 432, makes this profound insight concerning *Griswold:* "Indeed, the decision's concern for valued aspects of individual privacy may ultimately aid in protecting man from the dehumanization of an everencroaching technological environment."

The People concede, as they must, the fact, the existence of this expanding and as yet judicially unmeasured concept of individual privacy. However, they contend the State of California has the broad power to establish and enforce standards of conduct within its borders relative to health. This is a vital aspect of its police power. Within its ambit is the authority of the state to regulate the delivery of health services. (*Barsky* v. *Board of Regents,* 347 U.S. 442, 449 [98 L.Ed. 829, 74 S.Ct. 650, 654]; *People* v. *Nunn,* 46 Cal.2d 460, 469 [296 P.2d 813].)

This broad premise authorizes the invasion of the doctor-patient zone of privacy by the state to prohibit the doctor prescribing certain species of drugs. (*Blinder* v. *Division of Narcotic Enforcement,* 25 Cal.App.3d 174 [101 Cal.Rptr. 635].) The People point to *Whalen* v. *Roe, supra,* 429 U.S. 589, 603, fn. 30 [51 L.Ed.2d 64, 75, 97 S.Ct. 869, 878], and *Paris Adult Theatre I* v. *Slaton,* 413 U.S. 49, 65, 67 [37 L.Ed.2d 446, 461-463, 93 S.Ct. 2628], in support of this broad position.

The People concede any exercise of police power, depends in the first instance upon an articulated public interest in the activity to be regulated and second, the means used must be reasonably necessary for the

[2]In Morris L. Ernst's and Alan U. Schwartz's Privacy: The Right To Be Left Alone (1962), the history and broad sweep of this doctrine is documented. Samuel D. Warren and Louis D. Brandeis, in *The Right to Privacy* (1890) 4 Harv. L. Rev. 193, state: ". . . it has been found necessary from time to time to define anew the exact nature and extent of such protection."

accomplishment of that public purpose. (*Goldblatt* v. *Hempstead,* 369 U.S. 590, 594, 595 [8 L.Ed.2d 130, 133-135, 82 S.Ct. 987, 990].)

At the heart of the People's defense of Health and Safety Code section 1707.1 is the premise, Legislature declared,[3] that early and accurate diagnosis of cancer materially reduces the likelihood of death, prolongs useful life; where false or misleading representations are made to the public, large numbers rely upon such falsities, and needlessly die of cancer.

The People contend the California Legislature in enacting the statutory scheme made this implicit finding: Ineffective cancer remedies are more hazardous to the patient than the state sanctioned alternatives. (Health & Saf. Code, § 1700.)

Concerning the efficacy of amygdalin, this court, this opinion, does not enter that fray. The effectiveness of amygdalin as a cure for cancer or as a nutritional aid with general health giving benefits, is not, as a matter of law, an issue when the charge is a violation of Health and Safety Code section 1707.1. The issue here is human liberty. Can the informed cancer-ridden patient be limited in choice of treatment received from a

---

[3]Health and Safety Code section 1700 provides:

"The effective diagnosis, care, treatment or cure of persons suffering from cancer is of paramount public importance. Vital statistics indicates that approximately 16 percent of the total deaths in the United States annually result from one or another of the forms of cancer. It is established that accurate and early diagnosis of many forms of cancer, followed by prompt application of methods of treatment which are scientifically proven, either materially reduces the likelihood of death from cancer or may materially prolong the useful life of individuals suffering therefrom.

"Despite intensive campaigns of public education, there is a lack of adequate and accurate information among the public with respect to presently proven methods for the diagnosis, treatment, and cure of cancer. Various persons in this State have represented and continue to represent themselves as possessing medicines, methods, techniques, skills, or devices for the effective diagnosis, treatment, or cure of cancer, which representations are misleading to the public, with the result that large numbers of the public, relying on such representations, needlessly die of cancer, and substantial amounts of the savings of individuals and families relying on such representations are needlessly wasted.

"It is, therefore, in the public interest that the public be afforded full and accurate knowledge as to the facilities and methods for the diagnosis, treatment, and cure of cancer available in this State and that to that end there be provided means for testing and investigating the value or lack thereof of alleged cancer remedies, devices, drugs, or compounds, and informing the public of the facts found, and protecting the public from misrepresentation in such matters.

"The importance of continuing scientific research to determine the cause or cure of cancer is recognized, and the department shall administer this chapter with due regard for the importance of bona fide scientific research and the clinical testing in hospitals, clinics, or similar institutions of new drugs or compounds."

state licensed physician to "state sanctioned alternatives"?[4] To resolve these contrapoised contentions we must carefully analyze the nature of the right protected.

## II

### *The Patient's Right to Privacy*

The challenge of Dr. Privitera to Health and Safety Code section 1707.1 resolves itself, upon analysis, into two separate and distinct areas of claimed constitutional rights; there is the right of privacy of the patient to choose or reject his or her own treatment, orthodox or unorthodox, approved or unapproved by the state. The second contention is bifaceted: Dr. Privitera asserts (1) a derivative right—equal in stature to that of his patient, and (2) the doctor's independent right to practice medicine generally and to prescribe medicine, use procedures, without unreasonable government restrictions.

We examine first the right of the patient and determine this right is of such fundamental nature its free exercise may be impinged upon or forbidden only by such state interest as may be a "compelling interest."

The "fundamental" nature of this right derives from its source. It flows from the very nature of man. Justice Brandeis in *Olmstead v. United States, supra,* 277 U.S. 438, 478 [72 L.Ed. 944, 956, 48 S.Ct. 564, 572], stated: "The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. *They conferred, as against the government, the right to be let alone—the most comprehensive of rights and the right most valued by civilized men.* To protect that right, every unjustifiable intrusion by the government upon the privacy of the individual, whatever the means employed, must be deemed a violation . . . ." (Italics added.)

Judge Cardozo in *Schloendorff* v. *Society of New York Hospital,* 211 N.Y. 125 [105 N.E. 92, at page 93] stated: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; . . . ."

---

[4] *People* v. *Privitera,* 55 Cal.App.3d Supp. 39 [128 Cal.Rptr. 151].

The right to control one's own body is not restricted to the wise; it includes the "foolish" refusal of medical treatment. Nor is this right limited in its recognition to any single segment of the political, economic, or social thought spectrum. In commenting upon Justice Brandeis' most valued of rights, that right to be left alone, now Chief Justice Burger, in his dissent in *Application of President & Directors of Georgetown Col.* 331 F.2d 1010, at page 1017, stated: "Nothing in this utterance suggests that Justice Brandeis thought an individual possessed these rights only as to *sensible* beliefs, *valid* thoughts, *reasonable* emotions, or *well-founded* sensations. I suggest he intended to include a great many foolish, unreasonable and even absurd ideas which do not conform, such as refusing medical treatment even at great risk."

Without specific reference to a constitutional basis, the right to choose what may be a suicidal medical course has been upheld. In *Erickson* v. *Dilgard,* 44 Misc.2d 27 [252 N.Y.S.2d 705, 706] a New York court sustained the unwilling Jehovah's Witness' objection to a needed blood transfusion despite risk of death. The court there said at page 706: ". . . it is the individual who is the subject of a medical decision who has the final say and that this must necessarily be so in a system of government which gives the greatest possible protection to the individual in the furtherance of his own desires."

For analogy we look to the very heart of this right of choice of medical procedures, the right to beget or not to beget a child. In the case of *Griswold* v. *Connecticut, supra,* 381 U.S. 479 the Supreme Court held unconstitutional a Connecticut statute prohibiting the use of contraceptives. Following *Griswold* a series of United States Supreme Court cases have attempted to ascertain the boundaries of this aspect of privacy. The outer limits have not yet been determined. However, it is made clear by decision that unjustified government interference with personal decisions ". . . relating to marriage, *Loving* v. *Virginia,* 388 U.S. 1, 12 (1967); procreation, *Skinner* v. *Oklahoma,* 316 U.S. 535, 541-542 (1942); contraception, *Eisenstadt* v. *Baird,* 405 U.S. at 453-454; *id.,* at 460, 463-465 (White, J., concurring in result); family relationships, *Prince* v. *Massachusetts,* 321 U.S. 158, 166 (1944); and child rearing and education, *Pierce* v. *Society of Sisters,* 268 U.S. 510, 535 (1925), *Meyer* v. *Nebraska, supra*" (*Roe* v. *Wade, supra,* 410 U.S. 113, 152-153 [35 L.Ed.2d 147, 177, 93 S.Ct. 705, 726]) violate this concept.

*Roe* v. *Wade, supra,* 410 U.S. 113 dealt specifically with the rights to determine one's own medical treatment. The United States Supreme

Court held that the mother's constitutional right of privacy was broad enough to encompass her decision whether to terminate her pregnancy before the end of the first trimester of pregnancy. Said the court at page 163 [35 L.Ed.2d at p. 182]: "With respect to the State's important and legitimate interest in the health of the mother the 'compelling' point, in light of present medical knowledge, is at approximately the end of the first trimester." (*Roe* v. *Wade, supra,* 410 U.S. 113, 163 [35 L.Ed.2d 147, 182, 93 S.Ct. 705, 731].)

In the companion case, *Doe* v. *Bolton, supra,* 410 U.S. 179 the United States Supreme Court held the statutes requiring abortions to be conducted in hospitals, or accredited hospitals, requiring the interposition of a hospital abortion committee and thus limiting abortions to those circumstances was unconstitutional. In vindicating the woman's right of choice of medical care, the Supreme Court stated: "The woman's right to receive medical care in accordance with her licensed physician's best judgment and the physician's right to administer it are substantially limited by this statutorily imposed overview." (*Doe* v. *Bolton, supra,* 410 U.S. 179, 197 [35 L.Ed.2d 201, 216, 93 S.Ct. 739, 750].)

To support its conclusion, the Supreme Court examined the role of the licensed physician, saying: "If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment. If he fails in this, professional censure and deprivation of his license are available remedies. Required acquiescence by copractitioners has no rational connection with a patient's needs and unduly infringes on the physician's right to practice. The attending physician will know when a consultation is advisable—the doubtful situation, the need for assurance when the medical decision is a delicate one, and the like. Physicians have followed this routine historically and know its usefulness and benefit for all concerned. It is still true today that '[r]eliance must be placed upon the assurance given by his license, issued by an authority competent to judge in that respect, that he [the physician] possesses the requisite qualifications.' *Dent* v. *West Virginia,* 129 U.S. 114, 122-123 (1889). See *United States* v. *Vuitch,* 402 U.S. at 71." (*Doe* v. *Bolton, supra,* 410 U.S. 179, 199-200 [35 L.Ed.2d 201, 217, 93 S.Ct. 739, 751].)

In *Whalen* v. *Roe, supra,* 429 U.S. 589, the United States Supreme Court considered the New York statutory requirements with respect to prescriptions for "dangerous, legitimate" drugs. The requirement in question was that of notification. The court balanced the invasion of the zone of privacy against the public's right involved and concluded that

with respect to the particular type of drugs involved the statutes were a reasonable exercise of the state's broad police power. In so holding the court discussed the right of an individual to choice of treatment saying: "Nor can it be said that any individual has been deprived of the right to decide independently, with the advice of his physician, to acquire and to use needed medication. . . . Within dosage limits which appellees do not challenge, the decision to prescribe, or to use, is left entirely to the physician and the patient." (*Whalen* v. *Roe, supra,* 429 U.S. 589, 603 [51 L.Ed.2d 64, 75-76, 97 S.Ct. 869, 878].)

Concerning the doctor's "right to practice" *Whalen* points out: "The appellee doctors argue separately that the statute impairs their right to practice medicine free of unwarranted state interference. If the doctors' claim has any reference to the impact of the 1972 statute on their own procedures, it is clearly frivolous. For even the prior statute required the doctor to prepare a written prescription identifying the name and address of the patient and the dosage of the prescribed drug. *To the extent that their claim has reference to the possibility that the patients' concern about disclosure may induce them to refuse needed medication, the doctors' claim is derivative from, and therefore no stronger than, the patients'.* Our rejection of their claim therefore disposes of the doctors' as well." (Italics added; *Whalen* v. *Roe, supra,* 429 U.S. 589, 604 [51 L.Ed.2d 64, 76, 97 S.Ct. 869, 879].)

*Carey* v. *Populations Services Intern.,* 431 U.S. 678 [52 L.Ed.2d 675, 97 S.Ct. 2010], examines the question involving the availability of contraceptives to minors. The Supreme Court held the right to privacy in matters affecting procreation extends to minors as well as adults.

The California Supreme Court has set forth as a "postulate" or "axiomatic" the right to choose one's own "lawful" treatment. In *Cobbs* v. *Grant,* 8 Cal.3d 229, at page 242 [104 Cal.Rptr. 505, 502 P.2d 1], the court, in determining the duty of the physician to secure the informed consent of the patient to treatment, said: "Preliminarily we employ several postulates. . . . The second is that a person of adult years and in sound mind has the right, in the exercise of control over his own body, to determine whether or not to submit to lawful medical treatment."

*Aden* v. *Younger,* 57 Cal.App.3d 662 [129 Cal.Rptr. 535], held unconstitutional the provisions of Welfare and Institutions Code section 5326.4 requiring substantive review by a medical committee of a voluntary, competent patient's consent to choice of electro-shock treat-

ment. It was an unjustified infringement of the patient's right to privacy. This court stated at page 684:

"Where informed consent is adequately insured, there is no justification for infringing upon the patient's right to privacy in selecting and consenting to the treatment. The state has varied interests which are served by the regulation of ECT, but these interests are not served where the patient and his physician are the best judges of the patient's health, safety and welfare.

". . . Any possible need which exists for the voluntary and competent patient cannot prevail in the face of the serious infringement to the patient's right to privacy as guaranteed by *Roe* v. *Wade, supra,* 410 U.S. 113 and *Doe* v. *Bolton, supra,* 410 U.S. 179." (*Aden* v. *Younger, supra,* 57 Cal.App.3d 662, 684.)

This right-of-choice-of-medical-treatment concept reached its quintessence in the *Matter of Quinlan,* 70 N.J. 10 [355 A.2d 647]. The New Jersey Supreme Court was called upon to determine whether the father, as guardian of Karen Quinlan, a 21-year-old girl existing in a "persistent vegetative state," could be authorized to discontinue the extraordinary procedures sustaining the daughter's vital processes. The first question was: Did the comatose Karen Quinlan or her father have a right of choice to choose death or life? And secondly, could the father, through the court guardianship procedures, be authorized on her behalf to make such a choice? The court authorized, through the father-guardian, the withdrawal of the life support processes. The right of privacy inherent in the exceptional circumstances of that case authorized the rejection of the life support systems. Reasoned the court: "The claimed interests of the State in this case are essentially the preservation and sanctity of human life and defense of the right of the physician to administer medical treatment according to his best judgment. In this case the doctors say that removing Karen from the respirator will conflict with their professional judgment." (*Matter of Quinlan, supra,* 70 N.J. 10 [355 A.2d 647, 663].)

Yet, the court affirmed Karen's right to choice, had she been competent to assert it, and authorized the father to exercise it on her behalf: ". . . there would be no criminal homicide in the circumstances of this case. . . . [E]ven if it were to be regarded as homicide, it would not be unlawful." (*Matter of Quinlan, supra,* 70 N.J. 10 [355 A.2d 647, 669-670].) Concerning the interests of the state in preservation of human health and life the court said: "We have no hesitancy in deciding, in the

instant diametrically opposite case, that no external compelling interest of the State could compel Karen to endure the unendurable, . . . ." (*Matter of Quinlan, supra,* 70 N.J. 10 [355 A.2d 647, 663].)

### III

### *The Doctor's Zone of Privacy*

Dr. Privitera asserts a separate and distinct constitutionally protected right—a zone of privacy—to prescribe, to treat patients whether in the orthodox mode—free from unjustified state interference.

*Whalen* v. *Roe, supra,* 429 U.S. 589, accepts as a premise the existence of the right of the individual patient to choose independently *with* the advice of his physician to use or not to use a particular medication. Said the Supreme Court at page 603 [51 L.Ed.2d at p. 75]: "Nor can it be said that any individual has been deprived of the right to decide independently, with the advice of his physician, to acquire and to use needed medication." However, with respect to the doctor's right to freedom to treat, to minister to the sick, in *Whalen* v. *Roe, supra,* 429 U.S. 589, we have heretofore noted the Supreme Court's determination the "doctors' claim is derivative from, and therefore no stronger than, the patients'."

*Doe* v. *Bolton, supra,* 410 U.S. 179, however, speaks specifically of the *doctor's right* to administer medical care. *Bolton* involved a constitutionally defective statute requiring the consent of *two* state licensed physicians other than the patient's own doctor before an abortion could be performed as well as advance approval of three members of the hospital staff where the abortion was to be performed. Concerning this statute the Supreme Court said: "The woman's right to receive medical care in accordance with her licensed physician's best judgment *and the physician's right to administer it* are substantially limited by this statutorily imposed overview." (*Doe* v. *Bolton, supra,* 410 U.S. 179, 197 [35 L.Ed.2d 201, 216, 93 S.Ct. 739, 750]; italics added.)

Dr. Privitera additionally asserts an *independent* right to treat, not derived from or measured by his patient's right of choice, without first obtaining approval of the procedure or drug prescribed from a governmental board. He argues Health and Safety Code section 1707.1 invades this right. Again, as in the right of the patient, the doctor's asserted right must be first examined to determine its nature and thereby select the test, the degree of scrutiny to which the state interference will be put. The

right found must be balanced against the state—the public interest protected.

Dr. Privitera's right, in relation to the patient, has been viewed traditionally as a species of economic interest rather than as "fundamental" akin to the privacy right. If a rational basis was found to support an encroachment, the statute was sustained.

While a dispassionate reading of the physician's licensing requirements raises some question concerning the total rationality of the licensing scheme, such standards are generally upheld as reasonable and necessary means of protecting the public health.

The more recent cases hint at the more profound right in the doctor. It is postulated: There exists in the doctor licensed to practice medicine a right, constitutional in nature, as yet ill-defined, to treat and to treat by unorthodox modalities—as yet unapproved by the state board—an informed consenting patient.

*Doe* v. *Bolton, supra,* 410 U.S. 179, 200 [35 L.Ed.2d 201, 217, 93 S.Ct. 739, 751], states if a physician is licensed by the state he is recognized by the state as capable of expressing acceptable clinical judgment. If he fails in this, professional censure and deprivation of his license are remedies available and "reliance must be placed on the assurance given by his license . . . that he possesses the requisite qualifications."

*Roe* v. *Wade, supra,* 410 U.S. 113, 163 [35 L.Ed.2d 147, 183, 93 S.Ct. 705, 732], states concerning the termination of pregnancy during the first trimester: ". . . *the attending physician,* in consultation with his patient, *is free* to determine, without regulation by the State, that, in his medical judgment, the patient's pregnancy should be terminated." (Italics added.)

Reason, based on history, experience, supports the doctor's premise. To require prior state approval before advising—prescribing-administering—a new treatment modality for an informed consenting patient is to suppress innovation by the person best qualified to make medical progress. The treating doctor, the clinician, is at the cutting edge of medical knowledge.

To require the doctor to use only orthodox "state sanctioned" methods of treatment under threat of criminal penalty for variance is to invite a

repetition in California of the Soviet experience with "Lysenkoism."[5] The mention of a requirement that licensed doctors must prescribe, treat, within "state sanctioned alternatives" raises the spector of medical stagnation at best, statism, paternalistic Big Brother at worst. It is by the alternatives to orthodoxy that medical progress has been made. A free, progressive society has an enormous stake in recognizing and protecting this right of the physician.[6]

---

[5]Soviet geneticist T. D. Lysenko, controversial dictator of "communistic" biology during the Stalin period, stultified the science of genetics in the U.S.S.R. for at least a generation. He imposed the "state sanctioned alternative," the curious idea that environmentally acquired characteristics of an organism could be transmitted to the offspring through inheritance. Thus, the Stalinist concept of ideological conformity politically implanted in genetics paralyzed this important branch of Soviet science.

[6]Lest the reader suspect these conclusions are alarmist, without relevance to here and now, reference is made to Drug Regulation and Innovation—Empirical Evidence and Policy Options, by Henry G. Grabowski (1976). This is a summary of studies made—cost versus benefit analysis of the effects of the 1962 amendment which clothed the Federal Drug Administration with the authority to test new drugs for their "effectiveness" before permitting general prescription and use.

One study surveyed was that by Sam Peltzman. He researched the effect of the 1962 amendment on drug innovation: "In effect, Peltzman's . . . suggests that the rate of innovation in the post-amendment period is more than halved as a result of the 1962 amendments."

Did the Federal Drug Administration effectively weed out ineffective drugs? Peltzman's study shows: ". . . analysis of evaluations by medical experts suggests that the proportion of ineffective drugs has remained roughly the same in the pre-1962 and post-1962 periods. *Given that the rate of new drug introductions was more than halved in the post-amendment period, his analysis therefore suggests that a large decline took place in effective drugs.*" (Italics added.)

The conclusion reached by Professor Grabowski: "A consistent finding is that regulation has had a significant negative effect on the rate of innovation. While each of the individual studies has shortcomings, taken together they would seem to provide considerable support for the hypothesis that regulation has been one of the principal factors responsible for the observed decline in innovation."

Professor Grabowski's study shows: "An indication of the change is the decline in discovery and development of new chemical entities by U.S. firms—an initial decline from more than one-third of worldwide introductions in the year before the 1962 amendments to the Food, Drug, and Cosmetic Act to less than one-quarter of the total in 1963 . . . and unfortunately, as Professor Grabowski shows, a continued erosion of U.S. leadership thereafter. We have reached the point where innovations based on discoveries by U.S. firms and institutions constitute less than one-sixth of worldwide introductions of new chemical entities . . . and exports of pharmaceuticals as a share of U.S. exports have declined by one-third since the 1950s."

Decline in innovation is bad enough yet the public's safety has not been enhanced. According to Professor Grabowski: "One of the bitter ironies of this situation is that the 1962 amendments were spurred by an alarm over the *safety* of new drugs—by the fears created by the thalidomide incident. The irony lies in the fact that the 1962 amendments are keeping off the market new drugs that are safer than the drugs they would replace. Professor William Wardell's study of the lags in the introduction of new drugs in the United States cites, as one example, the five-year delay in the appearance on the U.S. market of a benzodiazepine hypnotic. If it had been available in the United States as it

## IV

### The Right of Privacy—
### Article I, Section 1, of the California Constitution

Thus far we have considered only the specific guarantees of the federal bill of rights and the emanations formed therefrom in concluding fundamental rights are encroached by section 1707.1. However: " '[I]n the area of fundamental civil liberties—which includes . . . all protections of the California Declaration of Rights—we sit . . . subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is California law and the full panoply of rights Californians have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but are to be followed by California courts only when they provide no less individual protection than is guaranteed by California law.' " (*Serrano* v. *Priest,* 18 Cal.3d 728, 764 [135 Cal.Rptr. 345, 557 P.2d 929] quoting *People* v. *Longwill,* 14 Cal.3d 943, 951, fn. 4 [123 Cal.Rptr. 297, 538 P.2d 753].) (See also *People* v. *Disbrow,* 16 Cal.3d 101, 114-115 [127 Cal.Rptr. 360, 545 P.2d 272]; *People* v. *Norman,* 14 Cal.3d 929, 939 [123 Cal.Rptr. 109, 538 P.2d 237]; *People* v. *Brisendine,* 13 Cal.3d 528, 548-552 [119 Cal.Rptr. 315, 531 P.2d 1099]; *Burrows* v. *Superior Court,* 13 Cal.3d 238, 245-246 [118 Cal.Rptr. 166, 529 P.2d 590]; *Mandel* v. *Hodges,* 54 Cal.App.3d 596, 615-617 [127 Cal.Rptr. 244]; *State* v. *Kaluna,* 55 Hawaii 361 [520 P.2d 51, 58-59]; *Baker* v. *City of Fairbanks,* 471 P.2d 386, 401-402; see generally Note, *Project Report: Toward an Activist Role for State Bills of Rights* (1973) 8 Harv.Civ.Rights—Civ.Lib.L.Rev. 271; Falk, *Foreword: The State Constitution: A More than "Adequate" Nonfederal Ground* (1973) 61 Cal.L.Rev. 273; Note, *Rediscovering the California Declaration of Rights* (1974) 26 Hastings L.J. 481.)

It is an "incontrovertible conclusion that the California Constitution is, and always has been, a document of independent force. Any other result would contradict not only the most fundamental principles of federalism

---

was in Great Britain during those five years, Professor Wardell estimates that 1,200 lives would have been saved.[5]"

"[5]William M. Wardell, 'Therapeutic Implications of the Drug Lag,' *Clinical Pharmacology and Therapeutics,* vol. 15, no. 1 (January 1974), p. 83." (Grabowski, Drug Regulation and Innovation—Empirical Evidence and Policy Options, p. 2.)

but also the historic bases of state charters." (*People* v. *Brisendine, supra,* 13 Cal.3d 528, 549-550.) We therefore must evaluate the rights infringed by section 1707.1 in light of our own Constitution.

Article I of the state charter is the California Declaration of Rights. Its first section establishes certain inalienable rights: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and *privacy.*" (Italics added.) "The [federal] constitution does not explicitly mention any right of privacy." (*Roe* v. *Wade, supra,* 410 U.S. 113, 152 [35 L.Ed.2d 147, 176, 93 S.Ct. 705, 726].) Neither did the California Constitution. However, "[i]n November 1972, the voters of California specifically amended article I, section 1 of our state Constitution to include among the various 'inalienable' rights of 'all people' the right of 'privacy.' " (*White* v. *Davis,* 13 Cal.3d 757, 773 [120 Cal.Rptr. 94, 533 P.2d 222].)

The California Supreme Court first addressed the significance of the new provision in *White* v. *Davis, supra,* 13 Cal.3d 757, 773-776. In that case the complaint asserted certain government surveillance and data-gathering activities abridged students' and teachers' constitutional right of privacy. In reversing a judgment entered upon the sustaining of a general demurrer, the court concluded the activities challenged did fall within the aegis of article[ I, section 1. The court "intimate[d] no opinion as to the resolution of the ultimate constitutional question after trial" (*White* v. *Davis, supra,* 13 Cal.3d 757, 776), and did not purport to sketch "the full contours of the new constitutional provision." (*Id.,* at p. 773.) Nevertheless, we are aided by its observations and analysis.

"The principal objectives of the newly adopted provision are set out in a statement drafted by the proponents of the provision and included in the state's election brochure." (*Id.,* at p. 774.) This statement represents, in essence, the only "legislative history" of the constitutional amendment available (*id.,* at p. 775), and "California decisions have long recognized the propriety of resorting to such election brochure arguments as an aid in construing legislative measures and constitutional amendments adopted pursuant to a vote of the people." (*Id.,* at fn. 11.)

After review of the ballot statements in *White* v. *Davis, supra,* 13 Cal.3d 757, the Supreme Court concluded: "Although the general concept of privacy relates, of course, to an enormously broad and diverse field of

personal action and belief, the moving force behind the new constitutional provision was a more focussed privacy concern, relating to the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society. The new provision's primary purpose is to afford individuals some measure of protection against this most modern threat to personal privacy." (*Id.,* at pp. 773-774.)

The rights here relied upon by Privitera do not fall within that "more focused privacy concern" of *White* v. *Davis, supra,* 13 Cal.3d 757; but rather relates to the "enormously broad and diverse field of personal belief and action." The state here does not seek to surveil or collect data about laetrile users or distributors. It seeks to circumscribe an even more profound compelling interest, that right which is but an "outward manifestation of the inward domain of the consciousness," the right to be left alone.

To find the legislative intent of the people of the State of California in enacting the amendment to article I, section 1, we look to the language of the election brochure which extends beyond data collection into the broader area of freedom of personal action and belief. The argument in favor of the amendment stated:

"*The right of privacy is the right to be left alone.* It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion, and our freedom to associate with the people we choose.

". . . . . . . . . . . . . . . . . . . . .

"The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth and Ninth Amendments to the U.S. Constitution. This right should be abridged only when there is compelling public need." (Italics added.)

The proponents of the amendment further stated (in rebuttal): "The right to privacy is much more than 'unnecessary wordage.' It is fundamental in any free society. Privacy is not now guaranteed by our State Constitution. This simple amendment will *extend* various court decisions on privacy to insure protection of our basic rights." (Italics added.)

This "legislative history" closely parallels the thoughts—uses the exact words—of Justice Brandeis in his prescient dissent in *Olmstead* v. *United States, supra,* 277 U.S. 438.[7]

Like Brandeis, the people of California have recognized the right to be left alone—the right to be free in the sphere of private action. It is "fundamental." It protects "our homes, our families, our thoughts, our emotions, our expressions, our personalities . . . ."[8]

Based upon the "legislative intent" derived from the express language of the election brochure we conclude a right, of California constitutional dimension, was enacted. This right is not just a shield against threats to personal freedom posed by modern surveillance and data-collecting activities. This state-protected right of privacy encompasses a fundamental and compelling interest of the cancer patient to choose or reject his or her own medical treatment on the advice of a licensed medical doctor. This right can be abridged only where there is compelling need.

[7]As if he had this case in mind, Brandeis insightfully cautioned: "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." (*Olmstead* v. *United States, supra,* 277 U.S. 438, 479 [72 L.Ed. 944, 957, 48 S.Ct. 564, 572-573]; Brandeis, J., dis.)

[8]Philosopher John Stuart Mill in his classic work On Liberty (George Routledge 1905) sets forth the philosophic underpinnings for this recently enunciated right to be left alone:

"[T]here is a sphere of action in which society, as distinguished from the individual, has, if any, only an indirect interest; comprehending all that portion of a person's life and conduct which affects only himself, or if it also affects others, only with their free, voluntary, and undeceived consent and participation. When I say only himself, I mean directly, and in the first instance; for whatever affects himself, may affect others through himself; . . . This, then, is the appropriate region of human liberty. It comprises, first, the inward domain of consciousness; demanding liberty of conscience, in the most comprehensive sense; liberty of thought and feeling; absolute freedom of opinion and sentiment on all subjects, practical or speculative, scientific, moral, or theological. . . . Secondly, the principle requires liberty of tastes and pursuits; of framing the plan of our life to suit our own character; of doing as we like, subject to such consequences as may follow; without impediment from our fellow-creatures, so long as what we do does not harm them, even though they should think our conduct foolish, perverse, or wrong. . . .

". . . The only freedom which deserves the name, is that of pursuing our own good in our own way, so long as we do not attempt to deprive others of theirs, or impede their efforts to obtain it. Each is the proper guardian of his own health, whether bodily, or mental and spiritual. Mankind are greater gainers by suffering each other to live as seems good to themselves, than by compelling each to live as seems good to the rest."

Mill concludes "over himself, over his own body and mind, the individual is sovereign." (Pp. 13-18.)

## V

### *The Nature of the State's Interest*

We have established this premise: The patient's and Dr. Privitera's rights of privacy are of such magnitude only a compelling state interest can justify intrusion in the patient-doctor treatment setting. We now consider the strength of that state interest. Does Health and Safety Code section 1707.1 serve a compelling state interest which overrides the rights so found?[9] Indeed, a state has a profound interest in maintaining medical standards and in protecting health, life. This justifies the testing and licensing of doctors and the limits on the giving of medical advice by qualified practitioners. The regulation of pharmaceuticals, the licensing requirements for pharmacists and other dispensers of drugs are so authorized. Harm to others is readily foreseeable. It is well settled the state has broad police powers in regulating the administering of certain types of drugs by the health professions. (See *Robinson* v. *California*, 370 U.S. 660, 664-665 [8 L.Ed.2d 758, 761-762, 82 S.Ct. 1417, 1419-1420]; *Minnesota* ex rel. *Whipple* v. *Martinson*, 256 U.S. 41, 45 [65 L.Ed. 819, 822, 41 S.Ct. 425, 426]; *Whalen* v. *Roe, supra,* 429 U.S. 589.)

The cases cited by the People in support of this unquestioned power of the state uniformly involve drugs which are narcotic, habit forming, toxic in nature. For example, as noted in *Whalen* v. *Roe, supra,* the New York Legislature had enacted a statutory scheme regulating dangerous, legitimate, drugs such as opium, cocaine, methadone. The state could "prohibit entirely [their] use." Therefore, the New York statute requiring

---

[9]John Stuart Mill, On Liberty, *supra,* gives substance to the concept of "compelling state interest" when he asserts: ". . . one very simple principle, as entitled to govern absolutely the dealings of society with the individual in the way of compulsion and control, whether the means used be physical force in the form of legal penalties, or the moral coercion of public opinion. *That principle is, that the sole end for which mankind are warranted, individually or collectively, in interfering with the liberty of action of any of their number, is self-protection. That the only purpose for which power can be rightfully exercised over any member of a civilized community, against his will, is to prevent harm to others.* His own good, either physical or moral, is not a sufficient warrant. He cannot rightfully be compelled to do or forbear because it will be better for him to do so, because it will make him happier, because, in the opinions of others, to do so would be wise, or even right. These are good reasons for remonstrating with him, or reasoning with him, or persuading him, or entreating him, but not for compelling him, or visiting him with any evil in case he do otherwise. To justify that, the conduct from which it is desired to deter him, must be calculated to produce evil to some one else. The only part of the conduct of any one, for which he is amenable to society, is that which concerns others. In the part which merely concerns himself, his independence is, of right, absolute. Over himself, over his own body and mind, the individual is sovereign."

the doctor to furnish the state with a copy of every prescription for such drugs did not unconstitutionally deprive a person of the right to decide independently with the advice of his physician to acquire or to use needed medication.

In *Minnesota* ex rel. *Whipple* v. *Martinson, supra,* 256 U.S. 41, 45 [65 L.Ed. 819, 822, 41 S.Ct. 425, 426], the Supreme Court reiterated this premise when examining a California statute which regulated morphine stating: "There can be no question of the authority of the state in the exercise of its police power to regulate the administration, sale, prescription and use of dangerous and habit-forming drugs, such as are named in the statute. The right to exercise this power is so manifest in the interest of the public health and welfare, that it is unnecessary to enter upon a discussion of it beyond saying that it is too firmly established to be successfully called in question."

In *Blinder* v. *Division of Narcotic Enforcement, supra,* 25 Cal.App.3d 174, 181, the authority of the State of California to regulate prescription by a doctor of a narcotic, habit forming, dangerous drug was vindicated. Plaintiff physician sought to prescribe the use of methadone as a necessary and effective method for the treatment of narcotic addiction. The statutes challenged by Dr. Blinder provided for treatment of addicts at certain places and specified periods of time and limited use of methadone in the treatment of other diseases. The court in *Blinder* held the limitations upon the prescription of methadone for treatment of addicts (Health & Saf. Code, §§ 11391 and 11395) were an appropriate exercise of the police power of the state and did not constitute a denial of equal protection of law or constitute cruel and unusual punishment. Concerning the right of the doctor to practice without state interference, *Blinder* v. *Division of Narcotic Enforcement, supra,* 25 Cal.App.3d 174, at page 181, states: "It is well established, moreover, that although the right to practice medicine, like the right to practice any other profession, is a valuable property right [citation], this right may not be exercised free of reasonable restrictions. 'The state clearly has the power to regulate professions in the interest of public health, safety and welfare.' [Citations.]" It should be noted in *Blinder,* as in *Whipple,* as in *Robinson,* and in *Whalen* v. *Roe, supra,* the drugs subject to this broad police power are drugs which are dangerous drugs in the sense that they are narcotic, habit forming, hallucinatory or toxic. Their use or misuse "concerns others." Laetrile is not in this class. It is generally conceded to be a harmless drug. Its alleged evil lies in its "ineffective" treatment of cancer.

The sole case authority submitted for the proposition that the state has the right under its police power to interfere in the doctor-patient relationship where the drug prescribed is amygdalin is *People* v. *Privitera*, 55 Cal.App.3d Supp. 39 [128 Cal.Rptr. 151], where the same Dr. Privitera was charged in the Municipal Court of Los Angeles with a series of misdemeanor violations of section 1707.1 (here charged as the substantive crime, the object of a felony conspiracy). The trial court there sustained defendant's demurrer on the ground section 1707.1 was unconstitutional. The Appellate Division of the Superior Court of Los Angeles County reversed and denied section 1707.1 was overbroad, arbitrary or unreasonable. It was within the constitutional power of the Legislature to prohibit the prescription of amygdalin for cancer treatment. For its authority the appellate division relied upon the cases we cite which warrant state intervention in the doctor-patient area in the control, distribution, use of narcotics and other dangerous drugs.

The *Privitera* court examined the procedure imposed by the Legislature for the prior administrative determination of whether the drug is recognized as safe and effective. For approval thereof, *Privitera* relies on the United States Supreme Court in *Weinberger* v. *Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 619 [37 L.Ed.2d 207, 217, 93 S.Ct. 2469, 2478], which held in passing upon the safety and efficacy of new drugs, strict scientific standards must be employed and not "anecdotal evidence indicating that doctors 'believe' in the efficacy of a drug." Concerning the problem of whether the scientific and medical authorities are in dispute the appellate division stated: " 'Where there is a genuine difference of medical opinion among the experts on the question of whether a drug is generally recognized as safe for the treatment of a particular disease, it must be concluded that the drug is not generally recognized as safe for the use in the treatment of that disease.' (*United States* v. *Article of Drug, etc.* (N.D.Ga. 1968) 294 F.Supp. 1307, 1311.)" (*People* v. *Privitera, supra*, 55 Cal.App.3d Supp. 39, 51.)

The appellate division examined the right of privacy question but found the state interest to be of such magnitude as to authorize prohibition of all treatment by physicians of cancer by any modalities other than "state sanctioned alternatives." Said *People* v. *Privitera, supra*, 55 Cal.App.3d Supp. 39, 52: "However, the California Legislature, in enacting the statutory scheme of cancer regulations, *made the implicit finding that alleged but ineffective cancer remedies are more hazardous to the patient than the state-sanctioned alternatives. We believe such finding to be reasonable.* One desperate for a cure but who seeks to avoid necessary

surgery because it is disfiguring, necessary radiation because it is debilitating or necessary chemotherapy because it is toxic, might in his extremity employ substances which are represented to be both harmless and curative. Knowing such propensity of these seriously ill, the Legislature exercised its police power to protect its citizens from the allegedly easier but fallacious cure." (Italics added.)

Reported cases specifically involving the authority, the right, of either the federal government or state to penalize, prohibit, amygdalin transportation, possession or use are rare. In *Rutherford* v. *United States,* 399 F.Supp. 1208, a class action was brought by cancer victims seeking to compel the Federal Drug Administration (FDA) to desist from precluding administration of amygdalin to patients suffering from cancer. By its nonaction, it was contended, the FDA made amygdalin not available. Rutherford sought medical advice in the United States. He was advised of the necessity of abdominal resection, removal of his rectum. He rejected these alternatives and sought laetrile treatment at a medical clinic in Tijuana, Mexico. There he was treated for a period of weeks and was returned as cured. He alleged without the continued use of the amygdalin he faced the prospect of escalation of the carcinoma.

The district court in *Rutherford* v. *United States, supra,* found that the FDA, under 21 United States Code section 355, had: ". . . abdicated its duty to make a clear determination of whether the drug laetrile should or should not be placed in commerce though the drug has been in use for many years and thousands of persons have been treated with it."

The court further found that from the records, testimony and exhibits that: ". . . laetrile is not lethal in any sense of the word. It is not harmful to the human body and when used in proper amounts under proper control and supervision can effect relief from cancer disease to the satisfaction of many who are privileged to use the same." (*Rutherford* v. *United States, supra,* 399 F.Supp. 1208, 1212.) In view of this failure of the Federal Drug Administration to act in accordance with the constitutional intent, the court found that Rutherford and others were wholly without means or resources to comply with the provisions of 21 United States Code section 355(b),[10] further that each of them was denied "the freedom of choice for treatment by laetrile to alleviate or cure their cancer."

---

[10] 21 United States Code section 355 provides in part: "(a) No person shall introduce or deliver for introduction into interstate commerce any new drug, unless an approval of an application filed pursuant to subsection (b) of this section is effective with respect to such drug."

Basing its decision upon the *Roe* v. *Wade, supra,* 410 U.S. 113, concept of the right of privacy as one of the rights formed by the emanations from the guarantees of the Fifth and Fourteenth Amendments, the court granted the requested injunctive relief.

*Rutherford* was reviewed *sub nomine Stowe* v. *United States of America* (10-12-75) D.C. No. CIV-75-0218-B (10th Cir.).[11] The court of appeals declined to review the district court's rulings laetrile was an effective treatment for cancer, was not toxic, and the new drug application provision, 21 United States Code section 355(a), was unconstitutional. Rather the court of appeals confined itself to the issue of whether the laetrile was a so-called "new drug" requiring FDA approval. The court of appeals held that the record made before the trial court was not sufficient but concluded the *"preliminary injunction granted by the district court in this case should be and the same is upheld."* (Italics added.)

After remand to the district court in opinion filed January 4, 1977, it was held: "In view, however, of the complete absence of any good-faith agency record in support of its position in this case, as the record here is not merely incomplete, but virtually nonexistent; and in appreciation of the fact that depriving a terminally ill cancer patient of a substance he finds therapeutic, whether such benefit is physical or psychological, creates the very real risk that irreparable injury might be sustained."

The district court injunction remains in effect pending remand to the FDA.

In *Carnohan* v. *United States of America, et al.,* United States District Court, Southern District of California (San Diego), Civil No. 77-0010-GT, plaintiff was a terminal cancer patient. He sought to enjoin the FDA's interference with his importation or interstate transportation of amygdalin for his own consumption.

The court found Carnohan was receiving laetrile in Mexico, and in order to receive the drug he must either choose to live in Mexico or he must commute daily for his treatment. The court weighed its basic authority for the issuance of injunctive relief against the harm to the public that could possibly occur by weakening laws calculated to prevent

---

[11]Stowe was the original plaintiff in the *Rutherford* case. He was a cancer patient and died in the pending of the suit. Rutherford and Mrs. Schneider filed further papers in the proceedings. Mrs. Schneider, Rutherford's coplaintiff, died before the hearing on the preliminary injunction which was issued by the district court.

victimization of cancer victims by playing on their desperate need. The court observed where a person is terminally ill with cancer and unresponsive to other treatments: ". . . the public harm is considerably reduced. Such a person would not be avoiding other methods of treatment generally [accepted] . . . ." Thereupon the court enjoined the United States Customs Service from interfering in Carnohan's possession and moving in interstate commerce not in excess of a three-month supply of laetrile pending completion by the FDA of its study.

These judicially carved out exceptions to the federal prohibition against importation or interstate transportation of amygdalin rest upon an unarticulated premise. No compelling state interest required enforcement of the laetrile ban in the recited circumstances.

## VI

### *Conclusions*

We turn now to the final, the pivotal question: Does the imposition of criminal sanction on the doctor for prescribing amygdalin as a cancer treatment for an informed consenting cancer victim, without first seeking governmental approval of its safety and effectiveness, serve a compelling state interest?

The Legislature has found the state's compelling interest derives from its "interest" in the "effective diagnosis, care, treatment or cure of persons suffering from cancer." (Health & Saf. Code, § 1700.) Further the Legislature found: ". . . accurate and early diagnosis of many forms of cancer, followed by prompt application of methods of treatment which are scientifically proven . . . reduces the likelihood of death from cancer . . . ." The People argue these are compelling reasons to deny cancer victims the prescription by a doctor of as yet an unapproved drug.

Without question, Health and Safety Code section 1707.1 is an attempt at exercise of legislative power in the area of public health to protect the cancer victim. The legislative concern expressed in section 1700 reflects a well founded and appropriate concern for misleading and false claims of cures for cancer. The section states a truism when it finds: "Various persons in this State have represented and continue to represent themselves as possessing medicines, . . . skills, . . . for the effective diagnosis, treatment, or cure of cancer, which representations are misleading to the public, . . . ."

However, upon what factual basis duly licensed doctors in the State of California are chargeable, let alone found guilty of the strictures made in the legislative finding is not clear. Why doctors, "recognized by the State as capable of exercising acceptable clinical judgment," are honored by being encompassed within that invidious class of "various persons" who "mislead" the public is obscure. "The . . . suggestion is necessarily somewhat degrading to the conscientious physician, . . . He, perhaps more than anyone else, is knowledgeable in this area of patient care, and he is aware of human frailty, . . . and needs." (*Doe* v. *Bolton, supra,* 410 U.S. 179, 196 [35 L.Ed.2d 201, 215, 93 S.Ct. 739, 750].)

The legislative finding gives no hint of what rational classification includes medical doctors within the ambit of quacks.

The doctor in California is licensed to practice only after meeting long rigid education, experience qualifications. He is bound by oath to preserve, to prolong, the life of his patient. He is under a legal duty, under threat of malpractice suit, to act in accordance with the generally accepted standards of medical practice in his community in this state. He is required under threat of malpractice to treat only after receiving the informed consent of the patient. (*Cobbs* v. *Grant, supra,* 8 Cal.3d 229.) These are the "rational means" society through law has imposed to insure a high standard of performance by the California doctor. It follows after such rigid standards are met, the matter of choice of treatment of the informed consenting patient becomes "a purely medical determination, which is within a doctor's professional judgment." (*Aden* v. *Younger, supra,* 57 Cal.App.3d 662, 677.) "Reliance must be placed upon the assurance given by his license, . . . that he possesses the requisite qualifications." (*Dent* v. *State of West Virginia,* 129 U.S. 114, 122-123 [32 L.Ed. 623, 626, 9 S.Ct. 231, 233].)

Limiting this exercise of the doctor's professional judgment on some vague suspicion that "various persons" in this state are engaging in quackery does not follow as a matter of logic.

The premise that "various persons,"—con man, snake oil salesman, —have made or will make false and misleading representations to the public concerning the diagnosis, treatment and cure of cancer certainly warrants, as rational means, the law which prohibits and makes criminal such acts. Health and Safety Code section 1714 accomplishes this precise purpose. It prohibits a false representation with intent to defraud of any device or substance or treatment as an effective cure for cancer. Dr.

Privitera does not contest the appropriateness of Health and Safety Code section 1714 as it does fit the announced legislative purpose.

We conclude the limitation upon the right to prescribe, to treat, of the doctor of section 1707.1 bears no logical relationship to the expressed legislative purpose. A fortiori, if there is a lack of reasonable relationship between the end sought and the means used, then certainly no compelling state purpose is present.[12]

Dr. Privitera is charged under Health and Safety Code section 1707.1. This statute requires for its breach an intent to prescribe the unauthorized drug or medicine for treatment of cancer. The efficacy of the treatment proposed or medicine prescribed is not an issue under this statute. The truth or veracity of the representations, disclosures, discussions, made in connection with the treatment, by the doctor to the patient are not an issue in a trial of charges made under section 1707.1.

The criminal liability attaches because the doctor in the exercise of his medical judgment has prescribed a drug for treatment of cancer not yet approved under section 505 of the federal Food, Drug and Cosmetic Act or which has not yet received approval of the state board. Whether the doctor in his best medical judgment believes he has a miracle drug, a food supplement or a hope-giving placebo is not an issue. The governmental agencies have not given approval; therefore the doctor cannot prescribe.

The patient's right to receive medical care, and the doctor's right to administer it are substantially limited not because of some established defect in the medication, some danger to the public if this patient is so treated. The doctor becomes a criminal because the government agency

---

[12]Refusing enforcement of Health and Safety Code section 1707.1 is totally compatible with (1) compulsory vaccination, (2) fluoridation of public water supplies, (3) requiring that certain drugs be available to the public on prescription from a licensed doctor, and (4) recognition of a compelling state interest in the health of a prospective mother at approximately the end of the first trimester of pregnancy. (*Roe* v. *Wade, supra,* 410 U.S. 113.) Philosopher Mill precisely located the line of demarcation between the individual's control of himself, his own body and mind, and the sovereignty retained by the state saying "there is a sphere of action in which society, as distinguished from the individual, has, if any, only an indirect interest." (Mill, On Liberty, *supra.*) The much quoted Holmes' observation that freedom of speech does not encompass the right to shout fire in a crowded theater rests upon the readily recognizable danger to society and thus authorizes state intervention. *Roe* v. *Wade, supra,* 410 U.S. 113, is a classic example of a silent application of the Mill reasoning by the United States Supreme Court in delineating the line between the mother's control over her own body and a public interest when there is another life and being.

has not given its prior approval to the exercise of his best medical judgment.

The statute must be measured against the legislative purpose of frustrating cancer quacks, and for the promotion of the early effective care, diagnosis and cure of cancer. Instead, the immediate and most direct effect of the prohibition of section 1707.1 is to chill, to prevent, innovative treatment by a licensed doctor, the person or in the class of persons most likely to make the hoped-for breakthrough against dreaded cancer. How logically this threat to the innovative physician will increase early effective diagnosis and cure of cancer is difficult to perceive.

*People* v. *Privitera, supra,* 55 Cal.App.3d Supp. 39 at page 52 of the supplement makes the following remarkable observation concerning that compelling state interest which supports Health and Safety Code section 1707.1: ". . . *ineffective cancer remedies* are more hazardous to the patient than the *state-sanctioned alternatives.*" (Italics added.)

The Legislature has not made such an express. finding and if such finding should be implied then it denies the patient the exercise of one of his most fundamental rights. He, instead, has the choice of "state sanctioned" treatment by the doctor or no treatment from the doctor at all. Again, if this be the legislative purpose, it misses its mark. Diminishing fraudulent cures, punishing quackery in cancer treatment, is a laudible objective. The means chosen by the Legislature is bureaucratically predetermined treatment or none, injected into a constitutionally protected area of privacy. This fundamental right of privacy, this right to be left alone, is "older than the Bill of Rights, older than our political systems." It cannot be swept away, denied by the processes of compelled acceptance of "state sanctioned alternatives."

It may be conceded that the dangers of treatment of cancer—or of any serious and disabling disease—by nonlicensed purveyor of medical services is fraught with dangers to the public and properly subject to legislative protection. Thus the difficulty with the statute as here applied is that it seeks to remedy the danger (that of a licensed medical doctor prescribing a treatment of a cancer patient without first getting approval of an administrative body) when that danger is not yet shown to exist.

If it be conceded section 1707.1 would theoretically assure some protection to the public or that unfortunate portion of the public who have cancer but who have not yet heard of the need for early treatment,

by prohibiting the use of amygdalin or any other unapproved modality by the licensed physician, yet under the law of this state and the United States any individual can possess, use, self-treat, his condition, whatever it may be, by use of amygdalin, to his heart's content without liability.[13] In effect it turns the whole matter of treatment back to the cancer patient himself if he is unwilling to accept the "state sanctioned alternatives."

We conclude not only is there no compelling reason shown to override the patient's or the doctor's fundamental right of choice in the treatment setting but that the statute when sought to be applied to a licensed medical doctor does not pass the test as a rational means of accomplishment of the announced legislative purpose.

There remains one further concern. The evidence in this case shows without exception the cancer victims, whether People's or defense's witnesses, were knowledgeable persons fully aware of the nature of the "state sanctioned alternatives" before seeking treatment from Dr. Privitera. Many were unwilling to accept the orthodox alternatives; many unwilling to accept the verdict of "terminal." These are not wide-eyed country bumpkins seeking to be conned. The class actions filed against governmental authorities to compel the availability of the drug in question illustrate the desperate seeking of the cancer victims.[14] We need cite only one witness as a basis for a composite picture: The patient is a "senior" citizen with diagnosed cancer of the prostate; treatment recommended—prostate removal and castration; female hormone treatment for the rest of his life. The victim simply refused to accept these alternatives and sought amygdalin treatment.

The 19 witnesses testifying for Dr. Privitera conveyed a felt imminency of death. One senses a mortal fear of both the disease and the orthodox alternatives. This is a desperate utterly human seeking to avoid the pain and to prolong life. These elements form the unspoken rationale

---

[13]See Ellen S. Hodgson, *infra,* page 687, footnote 240, pointing out this incongruity. The smuggler of laetrile: ". . . faced a $10,000 fine and five-year prison sentence—the maximum penalty imposed for smuggling an illegal drug intended for resale in the United States. *See* 18 U.S.C. § 545 (1970). That only the supplier, not the possessor, of laetrile is subject to criminal prosecution is due to the fact that the drug is not classified as a 'controlled' substance—like heroin or marijuana—the possession of which is illegal. However, because the FDA has not officially recognized the drug as 'safe,' it cannot be brought into the country or transported across state lines."

[14]See Hodgson, *Restrictions on Unorthodox Health Treatment in California: A Legal and Economic Analysis,* 24 UCLA L.Rev. 647, 683, 689, for an excellent and exhaustive review of case and statutory law.

of the *Rutherford* and *Carnohan* decisions. *Matter of Quinlan, supra,* 70 N.J. 10 [355 A.2d 647, 663], states the premise eloquently: ". . . no external compelling interest of the State could compel Karen to endure the unendurable, only to vegetate a few measurable months with no realistic possibility of returning to any semblance of cognitive or sapient life. We perceive no thread of logic distinguishing between such a choice on Karen's part and a similar choice which, under the evidence in this case, could be made by a competent patient terminally ill, riddled by cancer and suffering great pain; such a patient would not be resuscitated or put on a respirator . . . and *a fortiori* would not be kept *against his will* on a respirator."

To these 19 cancer victims the enforcement of Health and Safety Code section 1707.1, the denial to them of medical treatment, albeit unorthodox, albeit unapproved by a state agency, must surely take on a Kafkaesque, a nightmare, quality. No demonstrated public danger, no compelling interest of the state, warrants an Orwellian intrusion into the most private of zones of privacy.

The state has in the name of protecting the cancer victim criminalized the doctor who is willing to innovate, willing to try an unapproved drug with the consent of his patient. From the terminal patient's viewpoint a new depth of inhumanity is reached by a broad sweep of this law so interpreted. No compelling interest of the state requires Dr. Privitera's 19 cancer patients to endure the unendurable, to die, even forbidden hope.

Health and Safety Code section 1707.1 as here sought to be applied invades the patient's and the doctor's zone of privacy without showing of external compelling state interests in violation of the Fourteenth Amendment to the federal Constitution and article I, section 1 of the California Constitution.

**NEWMAN, J.**—I join in the Chief Justice's dissent, except that I would not rely on the federal Constitution. What the majority of my colleagues condone here is action that appears to me to constitute cruel and inhuman treatment. (Cf. dis. opn. in *Cramer* v. *Tyars,* 23 Cal.3d 131, 151, fn. 1 [151 Cal.Rptr. 653, 588 P.2d 793]. See too Rosenblatt, *Health Care Reform and Administrative Law: A Structural Approach* (1978) 88 Yale L.J. 243, 247 ["The Legal Structure of Health Care Reform: Creating the Appearance of Public Control"].)

By selective quotation the majority opinion downgrades the right of privacy in California, which "relates, of course, to an enormously broad and diverse field of personal action and belief . . . ." (*White* v. *Davis* (1975) 13 Cal.3d 757, 774 [120 Cal.Rptr. 94, 533 P.2d 222].) What the California Constitution in article I, section 1, guarantees is an inalienable right of "pursuing and obtaining safety, happiness, and privacy." By no means do those words merely mirror United States Supreme Court opinions. In *White* v. *Davis, supra,* Justice Tobriner's opinion for a unanimous court noted approvingly these statements from the official election brochure that help illuminate privacy's full scope: " 'The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion and our freedom to associate with the people we choose. . . .' " (*Id.,* at p. 774.) " 'The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth and Ninth Amendments to the U.S. Constitution. This right should be abridged only when there is a compelling public need. . . .' " (*Id.,* at p. 775.) In this case I detect no such need.

Appellants' petitions for a rehearing were denied April 12, 1979. Bird, C. J., and Newman, J., were of the opinion that the petitions should be granted.