*610
 
 Opinion
 

 BROWN (G. A.), P. J.
 

 Kate’ School, a California nonprofit corporation (the School)
 
 [1]
 
 is licensed by the State Department of Social Services
 
 [2]
 
 (the Department) as a community care facility (Health & Saf. Code,
 
 [3]
 
 §§ 1502, 1503, 1508, 1525)
 
 [4]
 
 for developmentally disabled children whose primary mental disorders are autism or childhood schizophrenia. In requiring the licensure of community care facilities it is the intent of the Legislature to “develop policies and programs designed to:. . . (3) protect the legal and human rights of a person in or receiving services from a community care facility. . . .” (§ 1501, subd. (b)(3).)
 

 This case brings into question the validity and effectiveness of certain regulations of the Department prohibiting certain behaviorial modification techniques involving the infliction of corporal punishment. We hold that the regulations are valid and effective and that the superior court’s findings of fact show a violation of them.
 

 The School holds three community care facility licenses—one for a day care center for forty-eight emotionally disturbed children, one for a small family home and one for a small group home.
 
 [5]
 

 In addition the School has pending applications for five additional small group licenses.
 

 Most of the children enrolled at the School suffer autism and a few from childhood schizophrenia. The behavior of these children is bizarre. They are withdrawn in their personalities, out of touch with reality and unable to relate to their environment or to other children and often to their own parents.
 
 [6]
 

 
 *611
 
 In May 1976 the Department filed an administrative pleading against the School seeking to revoke the School’s three licenses and to sustain the denial of its five additional license applications. The principal grounds alleged were a long series of instances of corporal punishment, humiliation and the abuse of children at the School.
 
 [7]
 

 After a 14-day hearing the administrative law judge filed findings of fact and conclusions of law setting forth in detail enumerated instances of corporal punishment and recommended the revocation of the School’s existing licenses and the denial of the additional applications. The proposed decision was adopted by the Department.
 

 Pursuant to Code of Civil Procedure section 1094.5, the School petitioned the superior court for a writ of administrative mandamus. A group of parents were granted amici curiae status.
 

 After a hearing the superior court made findings of fact and conclusions of law and directed the issuance of a peremptory writ ordering the Department to set aside its revocations and to reconsider the denial of the applications for additional licenses. The Department appealed.
 

 
 *612
 
 Discussion
 

 Section 1525
 
 [8]
 
 governs the issuance or renewal of permits. Section
 
 [9]
 
 sets forth the standards by which the Department is permitted to revoke or suspend existing licenses. Both sections are part of the Community Care Facilities Act.
 

 The pertinent regulations of the Department are section 80341 of title 22 of the California Administrative Code and section 152 of title 9 of that code.
 
 [10]
 
 Section 80341 provides: “Each person receiving services from a community care facility shall have rights which include, but are not limited to, the following:
 

 “(1) To be accorded dignity in his personal relationship with staff and other persons.
 

 “(3) Not to be subjected to corporal or unusual punishment, humiliation, mental abuse, withholding of monetary allowances or punitive interference connected with the daily functions of living, such as eating or sleeping.”
 

 Section 152 states: “Patients shall not be subjected to verbal or physical abuse of any kind. Corporal punishment of both minor and adult patients is prohibited.”
 

 
 *613
 
 Set forth in appendix 1 are the acts found by the superior court to have been committed by the School. They constitute many but not all of the acts found to have been committed by the administrative decision.
 

 The court further found that the School generally forbade those acts when visitors were present, that the acts were not done with evil motive and that the School was denied a fair hearing before the administrative law judge because sections 152 and 80341 are “so vague when considered in the light of extrinsic evidence of the meaning of the section, including proposed guidelines of the [Department], that [the School] was without prior notice of what conduct was proscribed thereby.”
 

 The School denied that it used acts of corporal punishment. It admitted, however, that there were infrequent and mild hand and calf slappings, restraining the movement of the head by holding the chin and a lock of hair for the purpose of establishing eye contact, cool showers to cleanse and to avert toilet accidents, and withdrawal of food. The School urges that the behaviorial modification techniques it used were part of a confrontation treatment program which had resulted in improvement in the behaviorial patterns of a number of the children to the delight of the parents. The Department does not contend that the School acted out of evil or sadistic motives.
 

 This type of behavior modification technique was variously referred to by the experts during the hearing as “negative reinforcement” or “aversive therapy.”
 
 [11]
 

 The parents urge that if sections 152 and 80341 of the Department’s regulations are construed to prohibit behavior modification through use of physical aversives, they violate the constitutional right of the parents to prescribe effective care for their mentally disordered children and the constitutional right to access to their treatment of choice, and further, that the regulations conflict with the legislative intent that all developmentally disabled persons receive appropriate treatment. We shall discuss the various contentions in order.
 

 
 *614
 
 Adverting first to the contention that the term corporal punishment as used in sections 152 and 80341 is vague and unenforceable, we note that the School has cited no authority which suggests that that term does not have a well recognized and plain meaning. “A statute should be construed where possible in favor of its validity and is to be given a reasonable and practical construction in accordance with the probable intent of the Legislature; it is not to be declared void for vagueness or uncertainty if any reasonable and practical construction can be given its language.”
 
 (Shea
 
 v.
 
 Board of Medical Examiners
 
 (1978) 81 Cal.App.3d 564, 574 [146 Cal.Rptr. 653].)
 

 Lexicographers’ definitions comport with the common understanding of the term. The term “corporal” is defined as “affecting, related to, or belonging to the body.” (Webster’s New Internat. Dict. (3d ed. 1961) p. 510.) The term “punishment” is defined as “the act of punishing . . . retributive suffering, pain, or loss . . . severe, rough, or disastrous treatment. . . .” (Webster’s New Internat. Dict. (3d ed. 1961) p. 1843.) Together, these words mean, “any kind of punishment of or inflicted on the body....” (Black’s Law Dict. (4th ed. 1968) p. 408.)
 

 The cases generally accept the term or its equivalent as having a clear meaning without discussion. In
 
 People
 
 v.
 
 Cameron
 
 (1975) 53 Cal.App.3d 786, 797 [126 Cal.Rptr. 44], this court held the term “corporal injury resulting in a traumatic condition” used in Penal Code section 273 d (child abuse) “appears to pose no difficulty of interpretation. The language, particularly in the context of this case is crystal clear.” In that case this court rejected the defendant’s argument that the section was unconstitutionally vague. (See also
 
 Ingraham
 
 v.
 
 Wright
 
 (1977) 430 U.S. 651 [51 L.Ed.2d 711, 97 S.Ct. 1401];
 
 Tarquin
 
 v.
 
 Commission on Professional Competence
 
 (1978) 84 Cal.App.3d 251 [148 Cal.Rptr. 522];
 
 Burton
 
 v.
 
 Board of Education
 
 (1977) 71 Cal.App.3d 52 [139 Cal.Rptr. 383];
 
 People
 
 v.
 
 Thomas
 
 (1976) 65 Cal.App.3d 854 [135 Cal.Rptr. 644];
 
 Harris
 
 v.
 
 Commonwealth Secretary of Ed.
 
 (1977) 29 Pa.Commw.Ct. 625 [372 A.2d 953].)
 

 It is apparent that the trial court considered the meaning of the term corporal punishment clear enough but was persuaded to hold it unclear and vague in the context of this case primarily because of a certain 61-page first draft of a document entitled “Guidelines for the Use of Behavioral Procedures in Community Care and Health Facilities for Developmentally and Mentally Disabled Children” which had been prepared by the Department and circulated for comment between the date of the hearing before the administrative law judge and the hearing
 
 *615
 
 before the superior court.
 
 [12]
 
 The guidelines were admitted into evidence at the trial court level over objection of the Department’s counsel.
 

 The draft guidelines were in the initial stage of development and were being prepared pursuant to section 80147,
 
 [13]
 
 title 22, of the California Administrative Code (hereinafter section 80147) and set forth the standards to be applied by the Department in evaluating an application for an exception to sections 152 and 80341 as to when limited and restricted forms of corporal punishment may be used.
 
 [14]
 

 The Department’s argument is two-pronged. First, it contends that the draft guidelines were not admissible at the superior court level because
 
 *616
 
 they were not in existence at the time of the administrative hearing and, secondly, if admissible at the superior court hearing the court used them for an improper purpose in concluding they demonstrated that the term corporal punishment is vague and indefinite.
 

 This court recently decided that subdivision (e) of Code of Civil Procedure section 1094.5
 
 [15]
 
 authorized the admission into evidence of matters which come into existence subsequent to the administrative hearing.
 
 (Windigo Mills
 
 v.
 
 Unemployment Ins. Appeals Bd.
 
 (1979) 92 Cal.App.3d 586, 597 [155 Cal.Rptr. 63].) That case disposes of the first contention. However, we agree that the court used them for an improper purpose. Section 80147 in conjunction with the existence of these guidelines demonstrates that the term “corporal punishment” in section 80341 was intended to be all-encompassing and that the Department interpreted section 80341 as being a prohibition of corporal punishment unless an exception was granted pursuant to section 80147. The interpretation of the Department is entitled to great weight in construing the regulation. (See
 
 Cal. Drive-In Restaurant Assn.
 
 v.
 
 Clark
 
 (1943) 22 Cal.2d 287, 294 [140 P.2d 656, 147 A.L.R. 1028].) Far from showing that the Department considered some forms of corporal punishment acceptable notwithstanding the prohibition in sections 152 and 80341, the draft guidelines conclusively show that sections 152 and 80341 mean what they say absent special permission granted by the Department. We can see no logical way in which the existence of these guidelines can be construed to give rise to a rational inference that the term “corporal punishment” is vague or unclear.
 

 The court suggests in its notice of intended decision (see fn. 12,
 
 ante)
 
 and in the findings
 
 [16]
 
 that the School may have been led to believe by the mere existence of the guidelines that certain types of corporal punishment may be used and are acceptable to the Department. As has been shown, in the absence of an exception granted by the Department pursuant to the guidelines and section 80147, they show no such thing. Moreover, it is uncontradicted that for a long period of time prior to the
 
 *617
 
 commencement of the proceedings herein the School was advised by the Department that its methods violated the regulations and it was given an opportunity to stop committing the prohibited acts. The School did not stop. In view of these facts and based solely upon the existence of the draft guidelines of which the School was not aware, we do not understand how the court could reasonably find that the School did not know that the term “corporal punishment” prohibited aversive therapy techniques by the infliction of physical pain.
 

 The School argues that a prohibition of corporal punishment is not a prohibition of treatment, stating the “program is intended, insofar as it invovles [sic] behavior modification, to correct abnormal behavior of the children and improve their behavior to the point where they may become useful members of society. It is clearly a function of
 
 treatment,
 
 and not of punishment. In the Application of the behavioral modification methods of Kate’ School personnel, there is no thought of retribution or of punishment for punishment’s sake.”
 

 On the contrary, we are of the opinion that the label placed upon an act or the alleged motivation of the person performing the act is not determinative of whether that act constitutes punishment. The prohibition of corporal punishment is the prohibition of all infliction of pain upon the body even where the motive is not evil and the act is done with the intention of treating. (See
 
 Knecht
 
 v.
 
 Gillman, supra,
 
 488 F.2d 1136, 1139;
 
 Vann
 
 v.
 
 Scott
 
 (7th Cir. 1972) 467 F.2d 1235, 1240;
 
 Clonce
 
 v.
 
 Richardson
 
 (W.D.Mo. 1974) 379 F.Supp. 338, 349.)
 

 It is appropriate that this be so because a community care facility is run by lay persons and is not a medical facility (see § 1502, fn. 4,
 
 ante).
 
 Such persons should not be permitted to inflict pain whatever the motivation. If the School’s argument were valid those who mean well could inflict pain on children in their care at will and would not be subject to penalty or disciplinaiy action.
 

 Moreover, the theoretical distinction which the School attempts to draw does not appear to be correct. The manifest purpose of applying corporal aversive therapy is to discourage inappropriate behavior. (See fn. 11,
 
 ante.)
 
 This is accomplished by applying negative reinforcement —i.e., pain—immediately following the undesirable conduct. The child, therefore, is being punished for his actions in the sense that he would not have been subjected to such treatment had he not performed the acts. While it is true that the primary goal of aversive therapy is to encourage
 
 *618
 
 appropriate behavior, it appears to us that the School’s arguments amount to no more than an attempt to relabel otherwise prohibited conduct with euphemisms.
 

 Before passing to a discussion of the issues raised by the parents we deviate to consider other issues relating to the applicability and validity of sections 152 and 80341.
 

 The court concluded that section 152 could not be used as a basis to revoke the School’s license under section 1550 (see fn. 9,
 
 ante),
 
 subdivisions (a) and (b), because section 152 was not promulgated under chapter 3 of the Health and Safety Code. The court further concluded that section 152 could not be used as a basis for revoking the School’s license under subdivision (c) of section 1550 because that subdivision was not set forth as a basis of discipline in the accusation filed by the Department. This determination together with the admitted fact that section 80341 (which was adopted pursuant to chapter 3) was not effective until August 31, 1975, had the effect of eliminating from consideration a major part of the evidence. For the reasons to be stated, the determination that section 152 could not be used as a basis for revocation of the license under subdivision (c) of section 1550 was prejudicial error.
 

 It is true that section 152, title 9, was not promulgated pursuant to chapter 3 of the Health and Safety Code and therefore by the terms of subdivisions (a) and (b) of section 1550 could not be used as a ground for revocation of existing licenses. For the same reason, violation of section 152 per se could not be used as a basis for the denial of the application for additional licenses under section 1525 (see fn. 8,
 
 ante).
 
 However, section 152 could be used as a basis of revoking the licenses under subdivision (c) of section 1550 since that subdivision does not require that the regulation issued by the Department be promulgated pursuant to chapter 3 of the Health and Safety Code.
 
 [17]
 

 No authority is cited by the School or the court for the conclusion that subdivision (c) of section 1550 cannot be a basis of revocation because it
 
 *619
 
 was not specifically pleaded. We have found no authority imposing such a hypertechnical requirement in administrative proceedings. Basic fairness requires that the School be given notice of the basis for the claimed disciplinary action and an opportunity to meet' the charges. In this case the School was not misled or prejudiced. All the facts constituting grounds for revocation were set forth in the accusation. Title 9 of the California Administrative Code was specifically mentioned in the accusation as a basis for revocation under section 1550, and section 152 was quoted verbatim. The cause was tried on the theory that the acts constituted a violation of all subdivisions of section 1550 and of section 152. The School fully defended itself against these charges. (See
 
 Morris
 
 v.
 
 Unemployment Ins. Appeals Bd.
 
 (1973) 34 Cal.App.3d 1002, 1006 [110 Cal.Rptr. 630].) We conclude that the trial court prejudicially erred in holding that the administrative law judge and the Department could not consider subdivision (c) of section 1550 and section 152 as a basis for revocation of the School’s licenses.
 

 Moreover, pre-August 31, 1975, acts in violation of section 152 could be properly utilized in denying the application for additional licenses under section 1525. Section 1525 provides if the Department “finds that the applicant is not in compliance with the laws or regulations of this chapter, the director shall deny the applicant a license. . . .” One of the laws with which the applicant must be in compliance is section 1520, which requires that a license application must include:
 

 “(a) Evidence satisfactory to the state department of the ability of the applicant to comply with the provisions of this chapter and of rules and regulations promulgated under this chapter by the state department. . . .
 

 “(b) Evidence satisfactoiy to the state department that the applicant is of reputable and responsible character. . . .”
 

 Evidence that over a period of years the applicant was unable or unwilling to comply with a then applicable regulation substantially similar to one promulgated under the Community Care Facilities Act is evidence which goes directly to the applicant’s ability to make the showing required by section 1520. Accordingly, though evidence of violations of section 152 could not be used as such in denying the applications, it is evidence properly considered by the Department on the question.
 

 
 *620
 
 The School for the first time in this court makes the argument that section 152 and section 80341 are invalid because they are administrative regulations in conflict with Welfare and Institutions Code section 4503, subdivision (g) (formerly Health & Saf. Code, § 38004, subd. (g)) which, according to the School’s contention, “provides to persons with developmental disabilities a statutory right to treatment, including the employment of ‘behavior modification techniques which cause pain or trauma.’ ” The argument is a nonsequitur. Welfare and Institutions Code section 4503 provides in pertinent part:
 

 “Each developmentally disabled person who has been admitted or committed to a state hospital [or] community care facility as defined in Section 1504 of the Health and Safety Code, . . . shall have the following rights,. . .
 

 “(g) To refuse behavior modification techniques which cause pain or trauma.” The section by its terms gives developmentally disabled persons the right to refuse but no right to receive such therapies, nor does it give anyone the right to use such therapies on them.
 

 We now take up the contentions of the group of parents appearing as amici curiae. Essentially the contentions are that to interpret sections 152 and 80341 as prohibiting corporal punishment as employed by the School in the treatment of their children conflicts with the due process clause of the federal and state Constitutions. Further, they argue that the provisions conflict with the legislative intent that all developmentally disabled persons receive appropriate treatment.
 

 Decisions regarding child rearing, care and education have been recognized as being entitled to protection as a fundamental right of personal liberty under the Constitution.
 
 (Whalen
 
 v.
 
 Roe
 
 (1977) 429 U.S. 589, 599-600 [51 L.Ed.2d 64, 73, 97 S.Ct. 869];
 
 People
 
 v.
 
 Privitera
 
 (1979) 23 Cal.3d 697, 702 [153 Cal.Rptr. 431, 591 P.2d 919];
 
 In re Roger S.
 
 (1977) 19 Cal.3d 921, 928 [141 Cal.Rptr. 298, 569 P.2d 1286].) However, this parental duty and right is subject to limitations “if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens.”
 
 (Wisconsin
 
 v.
 
 Yoder
 
 (1972) 406 U.S. 205, 234 [32 L.Ed.2d 15, 35, 92 S.Ct. 1526];
 
 People
 
 v.
 
 Privitera, supra,
 
 23 Cal.3d at p. 703;
 
 In re Roger S., supra,
 
 19 Cal.3d at p. 928.) If these conditions are present the state may assert important interests in
 
 *621
 
 safeguarding health and safety and in maintaining medical standards.
 
 (Roe
 
 v.
 
 Wade
 
 (1973) 410 U.S. 113, 153-154 [35 L.Ed.2d 147, 177, 93 S.Ct. 705];
 
 People
 
 v.
 
 Privitera, supra,
 
 23 Cal.3d at p. 703.) In
 
 Privitera,
 
 the Supreme Court recently held that when important interests of health and safety are involved the state’s regulations shall be tested under the rational basis test.
 
 (People
 
 v.
 
 Privitera, supra,
 
 at pp. 702, fn. 2, 703.) In that case the court decided that the right of privacy does not include a medical patient’s choice of treatment and the state had a compelling interest in regulating the use of the unproven substance Laetrile for the treatment of cancer.
 

 The evidence in this case shows that while there has been some success in the use of aversive therapies for the treatment of autism their use is still controversial and experimental. No one method has gained universal acceptance. In this regard it must be kept in mind that the Department does not seek to forbid all behavior modification therapy but only to regulate the circumstances and conditions under which such therapy may be used in a licensed community care facility. It must be emphasized that the private relationship between a patient and a private psychiatrist or doctor is not involved. The Department does not absolutely prohibit such therapy. If a facility desires to impinge upon a resident’s right to be otherwise free from corporal punishment, the state requires the facility to make a request for permission to operate such a program under section 80147. In acting upon the request the Department will determine if the proposed program offers adequate professional supervision and adequate human rights protection, a requirement having a rational relation to the state’s desire to protect the health and safety of the residents.
 

 We conclude that regulation of intrusive and possibly hazardous forms of treatment of mentally disordered children, such as are involved in behavior modification therapy through corporal punishment, is a proper exercise of the state’s police power and bears a rational relation to the state’s interest in the protection of the health and safety of the children as well as preventing a potential for significant social burdens. It follows that these regulations do not contravene constitutional limitations.
 

 As to the contention that the Legislature has mandated aversive therapy by enacting section 1501, subdivision (b)(1), (2), that body declared its intention that all developmentally disabled persons receive “appropriate” treatment. However, it does not follow that the Legislature mandated the use of behavior modification therapy involving pain or
 
 *622
 
 trauma which has not been authorized by the Department. The point is without merit.
 

 Conclusion And Disposition
 

 In sum we have described the applicability of section 80341 and section 152 to the issues of revocation and denial and have held that those sections are not vague and unenforceable and that they do not violate the constitutional rights of the parents or of the residents of the School.
 

 We have further determined that the motive or intent of the School does not make acts of corporal punishment permissible under those sections.
 

 As to the denial of the School’s applications for additional licenses pursuant to section 1525 and the revocation of existing licenses under subdivisions (a) and (b) of section 1550, admittedly section 80341, effective August 31, 1975, applies. The court entered a conclusion of law that; “Acts of Petitioner occurring after August 31, 1975 were not proscribed by Section 80341 of Title 22 of the California Administrative Code.” In view of the court’s specific findings of fact that certain acts amounting to corporal punishment took place during this period (see appen. 1, findings 9 XVII, XVIII, XIX, XX, XXII) we can only conclude that the court predicated the above conclusion upon the assumption that some acts of corporal punishment are not prohibited by section 80341. As we have pointed out, this is an erroneous legal assumption. Accordingly, the conclusion that section 80341 was not violated is not supported by the evidentiary findings made by the court.
 

 Similarly, as to section 152 the court found that there was not substantial evidence that the School committed acts which were proscribed by that section. Since section 152 was in effect during the entire 1972-1976 period it brought within its prohibitoiy language all of the acts of corporal infliction of pain found by the court to have occurred during that period. (See appen. 1.) Again, because the court’s conclusion is based upon an erroneous legal assumption, it is not supported by the evidentiary findings made by the court.
 

 It follows that the numerous acts of corporal infliction of pain found by the superior court (appen. 1) to have occurred at the School constitute violations of sections
 
 80341
 
 and/or 152 as a matter of law.
 

 
 *623
 
 Since our conclusions are based exclusively upon the findings by the superior court of acts committed by the School, it is unnecessary for us to review the superior court’s determination that the administrative agency’s findings are not supported by the evidence under the appropriate test applicable to the denial and revocation issues.
 

 If the action of an administrative agency, as here, is based upon a number of findings, several of which are subsequently determined on review by the superior court not to be true, it is appropriate to reverse the judgment and direct the superior court to enter a judgment instructing the agency to set aside its decision and to redetermine its order in light of the findings of the trial court.
 
 (Nightingale
 
 v.
 
 State Personnel Board
 
 (1972) 7 Cal.3d 507, 515 [102 Cal.Rptr. 758, 498 P.2d 1006];
 
 Shepherd
 
 v.
 
 State Personnel Board
 
 (1957) 48 Cal.2d 41, 51 [307 P.2d 4].)
 

 The judgment is reversed and the cause is remanded to the superior court with directions to issue its writ remanding the cause to the Department with directions to the Department to reconsider its order in light of this opinion.
 

 Franson, J., and Hopper, J., concurred.
 

 Respondent’s petition for a hearing by the Supreme Court was denied August 22, 1979.
 

 [1]
 

 The corporation was the nominal licensee. The persons actually' operating the School were Norman (executive director) and Martha Wilson (educational director), husband and wife.
 

 [2]
 

 As of July 1, 1978, the State Department of Social Services succeeded to all the functions of the former Department of Health.
 

 [3]
 

 All code references are to the Health and Safety Code unless otherwise indicated.
 

 [4]
 

 Section 1502 defines a community care facility as a facility in which nonmedical care is given to “. . . persons in need of personal services, supervision, or assistance essential for sustaining the activities of daily living or for the protection of the individual.”
 

 [5]
 

 The small family home is the residence of the licensee used for 24-hour care for no more than 6 residents. A small group home is a home other than the residence of the licensee used for 24-hour care. (See Cal. Admin. Code, tit. 22, § 80005.)
 

 [6]
 

 A thumbnail description of an autistic child was given by a psychologist at the hearing: “An autistic child is one who is a psychotic child in that they do not deal in what
 
 *611
 
 we would call reality. Their symptoms usually include a lack of responsiveness to social stimuli; that is, they don’t seem to know or care about other people, often don’t even know who their parents are. They are also characterized by the fact that they do not use language to communicate; that is, most of them are mute, or a little over half are mute and the rest are what we call echolalic, they will simply repeat what is said to them but they have no understanding of what it is they are saying. They are also children who are very withdrawn from their physical enviornment [j/c], have evidence and they are suspected of being blind or deaf when they are very young because they don’t respond to environmental stimulation in the same manner a normal child would. They also exhibit what we call self-sensory behavior, which includes flapping their arms, staring at their hands, staring at lights, staring out of the corner of their eye. Things like that. Repetitive motor behavior which doesn’t provide any function. Some of these children are self-abusive, they will bang their heads, hit themselves with their hands or fists in the face, in the head, hit themselves on the body. They will pinch themselves, bite themselves, scratch themselves, and be just generally self-abusive. Some of these children have isolated areas where they are really normal as far as skill, whereas they are retarded at most levels of functioning. Some of these are quite skillful in certain areas, which leads people to believe that they are not retarded. I think that kind of gives—I hope that gives a basic idea of what they are like.”
 

 [7]
 

 There were additional allegations concerning the lack of proper professional guidance and services. These were not found sustained by the superior court, and appellant has not argued to the contrary in this court. Consequently, these alleged violations are not issues before us. The evidence showed that the School employed a psychologist and psychiatrist for part-time professional supervision of its activities.
 

 [8]
 

 Section 1525 provides: “Upon the filing of the application for issuance or renewal of a license or for a special permit and substantial compliance with the provisions of this chapter and the rules and regulations of the department, the director shall issue to the applicant the license or special permit. If the director finds that the applicant is not in compliance with the laws or regulations of this chapter, the director shall deny the applicant a license, license renewal, special permit, or permit renewal.”
 

 [9]
 

 Section 1550 provides in relevant part: “The state department may suspend or revoke any license or special permit issued under the provisions of this chapter upon any of the following grounds and in the manner provided in this chapter: “(a) Violation by the licensee or holder of a special permit of any of the provisions of this chapter or of the rules and regulations promulgated under this chapter. “(b) Aiding, abetting, or permitting the violation of any provision of this chapter or of the rules and regulations promulgated under this chapter. “(c) Conduct in the operation or maintenance, or both the operation and maintenance, of a community care facility which is inimical to the health, morals, welfare, or safety of either an individual in or receiving services from the facility or the people of the State of California.”
 

 [10]
 

 These sections will hereinafter be referred to by section number without reference to the title or California Administrative Code.
 

 [11]
 

 In
 
 Knecht
 
 v.
 
 Gillman
 
 (8th Cir. 1973) 488 F.2d 1136, 1137, the court refers to aversive-type therapy as being based on “Pavlovian conditioning.” The court further explains: “Pavlovian conditioning is based on the theory that when environmental stimuli or the kinetic stimuli produced by the incipient movements of the punished act are made contiguous with punishment, they take on some of the aversive properties of the punishment itself. The next time the organism begins to act, particularly in the same environment, it produces stimuli which through classical conditioning have become aversive. It is these aversive stimuli which then prevent the act from occurring. Singer, Psychological Studies of Punishment, 58 Calif.L. Rev. 405, 423 (1970).”
 
 (Id.,
 
 fn. 2.)
 

 [12]
 

 In its notice of intended decision the court stated: “In itself, the section is, perhaps, clear enough. Resort to a dictionary would have been sufficient to inform Petitioner that its staff was highly restricted in the way it was permitted to deal with the children. However, further resort to Respondent’s first draft of ‘Guidelines for the Use of Behavioral Procedures in Community Care and Health Facilities for Developmentally and Mentally Disabled Children’ would tell Petitioner that Respondent was aware, for example, that certain forms of humiliation, mental abuse, punitive interference with eating and corporal punishment—such as ‘loud reprimands,’ ‘contingent mini meals,’ ‘slapping’ and ‘electric shock’ (p. 21)—are medically recognized as appropriate in dealing with and treating mentally disordered children; and that Respondent did not intend that Section 80341 be taken literally.” We note that the court’s notice of intended decision may be used to discover the process by which the trial court arrived at its conclusion and as an aid in interpreting its formal findings. (Cf„
 
 Kuffel
 
 v.
 
 Seaside Oil Co.
 
 (1977) 69 Cal.App.3d 555, 568-569 [138 Cal.Rptr. 575].)
 

 [13]
 

 Title 22, California Administrative Code, section 80147 provides that: “All community care facilities shall maintain continuous compliance with the licensing regulations. The use of alternate concepts, methods, procedures, techniques, equipment, space, personnel qualifications or staffing ratios, or the conduct of experimental or demonstration projects shall not be prohibited by these regulations.
 
 Such alternatives shall be carried out with provisions for safe and adequate services and with prior written approval of the Department or licensing agency. A written request and substantiating evidence supporting the request shall be submitted to the Department or licensing agency by the applicant or licensee.
 
 In determining the merits of each request, the Department or licensing agency shall use as guidelines the standards utilized or recommended by well-recognized state and national organizations in fields such as, but not limited to, child care, gerontology, mental health, developmental disabilities, rehabilitation, alcoholism and drug abuse.” (Italics added.)
 

 [14]
 

 The draft recites: “Two sections of the California Administrative Code, title 22, apply specifically to the establishment of the present guidelines. Section 80341 (a)(3) requires that patients receiving services from a community care facility not be subjected to corporal or unusual punishment, humiliation or mental abuse. Section 80147, however, allows the Department of Health or licensing agency to approve alternate concepts, methods, procedures, techniques, equipment, space, personal qualifications or staffing ratios. Similarly, the Lanterman act AB 38002 (h) states that a developmentally disabled person has ‘a right to be free from harm, including physical restraint, or isolation, excessive medication, abuse, or neglect’ and (i) a right to be free from hazardous procedures.’ AB 3005.1 states that ‘behavior modification may be provided only after review and approval by a peer review committee. The Director of Health shall, by March 1, 1977, adopt regulations establishing peer review procedures for this purpose.’ ”
 

 [15]
 

 Code of Civil Procedure section 1094.5 in relevant part provides: “Where the court finds that there is relevant evidence which, in the exercise of reasonable diligence, could not have been produced ... at the hearing before respondent. . . the court may admit such evidence. . . .”
 

 [16]
 

 The trial court’s statement in finding of fact 9-XXIII “[t]hat some forms of corporal punishment are recognized by Respondent [the Department]... as acceptable for use by Petitioner [Kate’ School]” appears to be based upon the draft guidelines since there was no other evidence which might have suggested that the Department found the use of corporal punishment by the School acceptable.
 

 [17]
 

 For the first time in this court the School argues that section 152 was not adopted pursuant to any statutory authority. This conclusion is erroneous. Section 152 was originally adopted by the State Department of Mental Hygiene pursuant to Welfare and Institutions Code section 5701 which has been renumbered several times during its history. In 1971 the State Department of Health succeeded to all functions which had formerly been performed by the Department of Mental Hygiene (see Health & Saf. Code, § 103), which included continued enforcement of still extant title 9 regulations. Thus, section 152 was valid and enforceable during the 1972-1976 period.